# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

THE UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                     No. CIV 16-2930 JB

CEDRIC LANEHAM,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Cedric Laneham's Motion for Disclosure of Information, filed August 11, 2017 (Doc. 112)("Motion"). The Court held a hearing on October 4, 2017. The primary issue is whether the Court should grant Cedric Laneham's request for extraneous discovery relating to his selective enforcement claim, which depends on whether Laneham has provided sufficient evidence that the United States' Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") acted with discriminatory intent and caused a discriminatory effect against African-Americans when it conducted a four-month operation in southeast Albuquerque, New Mexico, in 2016. The Court concludes that Laneham's statistical and anecdotal evidence fails to establish sufficient evidence that the ATF caused a discriminatory effect by treating similarly situated individuals differently than it treated African-Americans, or that the ATF agents or their confidential informants ("CIs") acted with discriminatory intent against African-Americans. Consequently, the Court denies the Motion.

## FACTUAL BACKGROUND

The Court sets forth the facts as Plaintiff United States of America alleges them in its Indictment, filed June 30, 2016 (Doc. 1), in the United States' Response to Defendant's Motion

to Compel Discovery, filed August 28, 2017 (Doc. 115)("Response"), at the evidentiary hearing held October 4, 2017, Transcript of Hearing (taken October 4, 2017)("Tr."),[1] and at the evidentiary hearing in a related case, see United States v. Casanova Motion Hearing Transcript (taken April 5, 2017), filed May 3, 2017, No. CR 16-2917 JAP (Doc. 51)("Casanova Tr."), bearing in mind that Laneham[2] is presumed innocent of all charges, Estelle v. Williams, 425 U.S. 501, 503 (1976)("The presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice." (citing Coffin v. United States, 156 U.S. 432, 453 (1895))). The Court recites the United States' version of the facts not out of any predisposition to believe the United States' side of the story, but because the Court does not have alternative accounts,[3] and it needs a cogent, internally consistent version of events for its analysis. See In re Winship, 397 U.S. 358, 365 (1970)("[W]e explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.").

These findings of fact are solely for use in deciding whether to permit discovery. They

---

[1] The Court's citations to the hearing's transcript refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

[2] The Defendant stated, in a previous motion, that his "true name is Cedric Lee, not Cedric Laneham." Opposed Motion for Review of Order of Detention Pending Trial at 1 n.1, filed July 24, 2016 (Doc. 35). Consequently, the Court referred to him as Cedric Lee in its Memorandum Opinion and Order at 1 n.1, filed September 2, 2016 (Doc. 45). In the Defendant's Motion, however, he refers to himself as Cedric Laneham, see, e.g., Motion at 1, so the Court will, in this Memorandum Opinion and Order, refer to the Defendants as Cedric Laneham.

[3] The defendant in a criminal case, on the other hand, need not present a cogent theory of the case or propose a comprehensive factual story. He or she may sit back and attempt to poke holes in the United States' theory of the case, and need not put on any case at all. See United States v. Wittig, No. 03-40142-JAR, 2005 WL 758606, at *4 (D. Kan. April 4, 2005) (Robinson, J.)("It is axiomatic that a defendant has a presumption of innocence, which means that a defendant need not present evidence, as the defendant has no burden of proof in a criminal case." (footnote omitted)).

do not bind, without more, the Court or the parties if Laneham proceeds to file a motion to dismiss without the requested discovery. Also, they do not, of course, bind the Court, the jury, or the parties in any jury trial.

1.    African-Americans comprised 5.4 percent of drug trafficking offenders and 5.9 percent of firearm-related offenders in the District of New Mexico between fiscal years 2006 and 2015. See Race Offenders in Each Primary Offense Category, District of New Mexico, Fiscal Years 2006-2016, https://isb.ussc.gov (follow "Demographic Data" hyperlink; then search "Race of Offenders in Each Primary Offensive Category"; then select "District of New Mexico" for fiscal years 2006-2015), filed August 11, 2017 (Doc. 112-1)("DNM statistics").

2.    African-Americans comprise 3.4 percent of Bernalillo County residents in 2016. See US Census QuickFacts: Bernalillo County, https://www.census.gov/quickfacts/fact/table/bernalillocountynewmexico/PST045216, viewed October 9, 2017.

3.    The ATF came to Albuquerque, New Mexico, because of its high violent crime rate.[4] See Tr. at 4:11-22 (Johnson).

4.    In developing a plan for an Albuquerque operation, the ATF spoke with the Albuquerque Police Department, Bernalillo County, New Mexico's Sheriff's Office, the United States Marshals, the Drug Enforcement Agency, the United States Attorneys for the District of

---

[4]In 2015, New Mexico had the third-highest violent crime rate in the United States. See Elise Kaplan and Nicole Perez, Crime on the Rise in State, Albuquerque, FBI says, Albuquerque Journal, September 26, 2016, available at https://www.abqjournal.com/853053/fbi-new-mexico-murders-jumped-nearly-16-percent-last-year.html; Crime in the United States by State, 2015, available at https://ucr.fbi.gov/crime-in-the-u.s/2015/crime-in-the-u.s.-2015/tables/table-5 (accessed October 12, 2017). Albuquerque metro area -- which includes Bernalillo, Sandoval, Torrance, and Valencia counties, and comprised 905,803 people in 2015 -- experienced 796 violent crimes per 100,000 residents in 2015, which was 8.4 percent higher than the violent crime rate in metro areas with over 250,000 people, but 4.8 percent lower than the violent crime rates in metro areas with between 500,000 and 999,999 people. See https://ucr.fbi.gov/crime-in-the-u.s/2015/crime-in-the-u.s.-2015/tables/table-16.

New Mexico, and the Albuquerque District Attorney. See Tr. at 5:4-11 (Johnson).

5.     Based on those consultations, the ATF determined that "the most violent part of Albuquerque was the southeast quadrant." Tr. at 5:11-14 (Johnson). Consequently, the ATF focused its operations on the southeast part of Albuquerque. See Tr. at 6:1-4 (Johnson).

6.     The targeted region was roughly the area south of Interstate 40, east of Interstate 25, "with Central Avenue being basically the main vein through that area." Tr. at 6:8-13 (Johnson).

7.     The ATF did not decide to focus on southeast Albuquerque because of the area's demographics. See Tr. at 15:24-16:8 (Johnson).

8.     The ATF's Albuquerque operation lasted four months in 2016 and was known as the Surge. See Tr. at 3:13 (Johnson).

9.     In the Surge, the ATF "brought in undercovers and confidential informants into the city of Albuquerque to combat violent crime." Tr. at 3:15-18 (Johnson).

10.     The ATF relied on five CIs, three of whom were black[5]; and nine primary

---

[5]On cross-examination in United States v. Casanova, another ATF Surge-related case, Johnson stated that two of the CIs were black, and "one was black Asian." No. CR 16-2917 JAP, Motion Hearing Transcript at 40:3-4 (taken April 5, 2017)(Johnson), filed June 12, 2017 (Doc. 57)("Casanova Tr."). That assertion led to the following exchange:

Q. When you say "black Asian," I guess that gets us into the difficult question of race in America. Did the person appear as if he would be considered an African-American?

A. Depending on who is looking at it. He was light-skinned with a long pony tail . . . .

Q. Tiger Woods, he's black and Asian. Does he appear to be black or Asian?

A. That would be subjective.

Casanova Tr. at 40:3-12 (Pori, Johnson). The Court will, construing the information most

undercover agents, one of whom was black.  Tr. at 35:6-12 (Hotchkiss, Johnson).

11.     The ATF instructed the CIs to "try to meet individuals that stated they were engaged in violent crime."  Tr. at 7:3-5 (Johnson).

12.     When a CI met someone whom the CI believed would sell drugs or weapons, the CI would inform the ATF, and the ATF "would then vet that information" and determine whether that person was worth pursuing.  Tr. at 7:8 (Johnson).

13.     If the ATF determined that the person was worth pursuing, they would try to "set up a transaction . . . where one of [the ATF] undercover agents along with the CI would go meet with the individual."  Tr. at 7:8-14 (Johnson).

14.     The ATF did not instruct the CIs on avoiding racial bias, nor did they train the CIs beyond how to operate their cell phones.  See Casanova Tr. at 92:17-21 (Pori, Johnson).

15.     Johnson did not believe that the CIs were racially biased in choosing whom to target, because: (i) he had worked with all the CIs previously and had "never seen any sort of bias from any of them," see Tr. at 45:22-23 (Johnson); and (ii) the ATF can get a sense of what the CIs are up to because they have access to the CIs' call logs and text messages, and may ask a person that a CI contacted what the CI told him or her, see Tr. at 40:10-15 (Johnson).

16.     The ATF did not keep records of everyone with whom CIs made contact, nor did the ATF record their races.  See Casanova Tr. at 66:20-22 (Johnson).

17.     There was no formal process or written guidelines for determining whom to pursue.  See Casanova Tr. at 83:16-21 (Johnson).

18.     Instead, the ATF made "collaborative group decisions," Casanova Tr. at 83:11, that did not follow "a specific process" involving particular people, Casanova Tr. at 85:8-10, and

---

favorably to Laneham, count the CI as an African-American.

the ATF did not make a record of those decisions, <u>see</u> Casanova Tr. at 85:14-17 (Pori, Johnson).

19.     In deciding whether to pursue someone, the ATF agents considered "all known factors," such as "known criminal history, criminal reputation, . . . [and] intelligence received from the Albuquerque Police Department," but there was no "set-in-stone criteria."  Tr. at 7:18-25 (Johnson).

20.     A person's race was "absolutely not" a factor.  Tr. at 13-9:14 (Johnson).

21.     The ATF did not have any targets in mind before beginning its operation in Albuquerque, and instead "generated [targets] very fluidly" by following its CIs' connections towards someone ATF deemed worth arresting.  Tr. at 9:2-13 (Johnson).

22.     The ATF did not arrest every individual that it could have arrested, and instead focused on "the worst of the worst."  Casanova Tr. at 80:25 (Johnson).

23.     Arresting an eighteen year old for possessing a half ounce of methamphetamine will not impact a city or change a neighborhood.  <u>See</u> Casanova Tr. at 81:12-23 (Johnson).

24.     The ATF wanted to arrest the people who, if taken off the streets, would make the city safer.  <u>See</u> Casanova Tr. at 81:12-23 (Johnson).

25.     The people that the ATF's CIs encountered in southeast Albuquerque were willing to interact with people of different races, which is not the case in many other cities.  <u>See</u> Tr. 13:5-6 (Johnson).

26.     This dynamic occurred during the Surge, and no one told Johnson to expect that dynamic before beginning the Surge.  <u>See</u> Tr. at 35:21-36:16 (Johnson).

27.     Johnson first learned of Cedric Laneham on April 29, 2016.  <u>See</u> Tr. at 61:25 (Johnson).

28.     The ATF discovered that the criminal organization known as the Memphis Mob

- 6 -

had members operating in Albuquerque, and that, based on police records, Laneham was one of the Memphis Mob's "highest ranking members" in Albuquerque.  Tr. at 17:15-18:12 (Johnson).

29.     According to the Albuquerque Journal, the Memphis Mob is a Memphis-based gang that moved into Albuquerque in the mid-2000s to "set up a drug-trafficking network linked to Memphis."  T.J. Wilham, *Cops Bust 'Memphis Mob'*, The Albuquerque Journal (Apr. 9, 2009), https://www.abqjournal.com/news/metro/0985859069newsmetro04-09-09.htm.

30.     One of the "big reasons" that the Memphis Mob moved into New Mexico was the "lax state laws."  Tr. at 29:20-23 (Johnson).

31.     Although the ATF knew about Laneham, it did not actively pursue him.  See Tr. 19:24-25 (Johnson).

32.     In May, 2016, the ATF learned that another high-ranking Memphis Mob member, Brent Williams, was opening a smoke shop in southeast Albuquerque.  See Tr. at 22:15-18 (Johnson).

33.     The ATF sent a CI to the smoke shop [to] "try to get further into the Memphis Mob organization."  Tr. at 19:3-8 (Johnson).

34.     While in the smoke shop, a man named Devell Devoual -- a co-Defendant in this case -- approached the CI and offered to sell the CI methamphetamine.  See Tr. at 22:18-20 (Johnson).

35.     The CI took Devoual's cell phone number.  See Tr. at 22:21-22 (Johnson).  The CI gave the ATF the cell phone number, and an undercover agent called Devoual and arranged to buy methamphetamine on May 17, 2016.  See Tr. at 23:15-21 (Johnson).

36.     The CI who visited the smoke shop is African-American.  See Tr. at 59:2-6 (Hotchkiss, Johnson).

37.     Devoual is African-American.  See Tr. at 42:14-16 (Hotchkiss, Johnson).

38.     Williams is African-American.     See ATF Surge Defendants Spreadsheet (undated) at line 29, filed September 11, 2017 (Doc. 119-2).

39.      On May 17, 2016, the undercover agent met Devoual at a 7-Eleven parking lot. See Tr. at 24:6-9 (Johnson).

40.     The undercover agent then followed Devoual's vehicle and another vehicle -- a Mitsubishi Gallant -- to a nearby street.  See Tr. at 24:10-13 (Johnson).

41.     Devoual "exited his vehicle, got into the white Gallant, exited the white Gallant, [and] motion for the undercover [agent] to come over."  Tr. at 24:14-16 (Johnson).

42.     The undercover agent stepped into the white Gallant's back seat and saw a man who the ATF would later identify as Laneham sitting in the driver's seat.  See Tr. at 24:16-18 (Johnson).

43.     Laneham had a handgun in his lap.  See Tr. at 24:25-25:1 (Johnson).

44.     Laneham "handed the undercover [agent] a scale and a white plastic bag which contained a substance that he recognized to be methamphetamine."  Tr. at 24:19-21 (Johnson).

45.     The undercover agent weighed the methamphetamine, paid Laneham, and left. See Tr. at 24:21-25:1 (Johnson).

46.     The ATF identified Laneham as the man in the white Gallant by running his license plate, which led them to a residential address, and Laneham was "one of the individuals tied to that residence."  Tr. at 25:14-20 (Johnson).

47.     The ATF acquired Laneham's driver's license photograph and the undercover agent confirmed that Laneham was the man in the white Gallant.  See Tr. at 25:20-24 (Johnson).

48.     On May 18, 2016, Johnson reviewed Laneham's criminal history "and learned

that he had six felony convictions, at least three aggravated assault arrests, [and] numerous drug traffic arrests." Tr. at 21:7-11 (Johnson).

49.     The ATF became interested in pursuing Laneham because of his criminal history. See Tr. at 30:12-18 (Johnson).

50.     The ATF arrested Laneham on July 6, 2016. See Tr. at 54:15 (Johnson).

51.     The United States charged Laneham for (i) conspiring with two others -- Devoual and Defendant Dwayne Cunningham -- to distribute 50 grams and more of a mixture and substance containing a detectable amount of methamphetamine; and (ii) distributing the mixture containing methamphetamine. See Indictment at 1-2.

52.     On June 7, 2016, a CI and an undercover agent arranged to meet a man named Yusef Casanova in a parking lot to purchase methamphetamine and a weapon. See United States v. Casanova, United States' Brief on the Issue of Discovery at 2-3, filed September 15, 2017 (Doc. 66).

53.     Casanova sold Johnson a shotgun, and Casanova explained that someone else would be arriving to deliver the methamphetamine. See Tr. at 53:21-25 (Johnson). Eventually a car arrived and an unidentified white male stepped out of the passenger side door and delivered a bag of what appeared to be methamphetamine. See Tr. at 53:1-11 (Johnson).

54.     The ATF did not arrest either Casanova or the white male at that time. See Tr. at 53:12-19 (Johnson).

55.     The ATF will typically not arrest people immediately after a deal with an undercover officer, because doing so would signal that the undercover agent is actually a law enforcement officer. See Tr. at 53:18-25 (Johnson).

56.     Despite recording and running the license plate number of the car carrying the

white male who delivered the methamphetamine that Casanova sold to the undercover officer, the ATF was unable to identify him.  See Tr. at 54:8-11 (Johnson).

57.     The ATF ran the unidentified white male's license plate, which led them to a photograph of the car's registered owner, who was not the unidentified white male.  See Tr. at 57:1-7 (Johnson).

58.     The ATF searched law enforcement databases for people associated with the license plate.  See Casanova Tr. at 27:16-21 (Johnson).

59.     The ATF did not speak with the registered owner or anyone associated with the license plate number.  See Tr. at 57:22-24 (Hotchkiss, Johnson).

60.     The ATF reviewed photographs of Casanova's associates, but did not see the unidentified white male.  See Tr. at 58:6-12 (Johnson).

61.     The ATF did not interview people about the unidentified white male, because, after the Casanova transaction, "[The ATF] had an operation going" with CIs and undercover agents still working, so "[The ATF] couldn't go out and be overt [by] trying to interview the registered owners."  Tr. at 62:5-14.

62.     Just the "operational security issue of [doing those interviews] would have put people in danger."  Tr. at 62:15-18 (Johnson).

63.     The ATF exhausted all investigative avenues available to try to identify the white male.  See Casanova Tr. at 28:1-3 (Johnson).

64.     Of the 103 Surge Defendants, twenty-eight -- 27.1  percent -- were African-Americans.  See ATF Surge Defendants Spreadsheet.

### PROCEDURAL BACKGROUND

A federal grand jury indicted Laneham, along with his two co-Defendants, Devoual and

Cunningham, on June 30, 2016.  See Indictment at 1.  The Indictment charges Laneham with two crimes.  See Indictment at 1-3.  First, it charges him with one count of conspiring to distribute 50 grams or more of a mixture and substance containing a detectable amount of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1); (b)(1)(B); and 21 U.S.C. § 846.  See Indictment at 1-2.  Second, the Indictment charges Laneham with "unlawfully, knowingly and intentionally distribut[ing] a controlled substance, 50 grams and more of a mixture and substance containing a detectible amount of methamphetamine" in violation of 21 U.S.C. §§ 841(a)(1); (b)(1)(B); and 18 U.S.C. § 2.  Indictment at 1-2.

On July 12, 2016, the Honorable Karen B. Molzen, Chief Magistrate Judge entered a Detention Order denying Laneham's request to be released to a third-party custodian pending trial, determining that Laneham poses a serious risk of danger to the community and presents a serious flight risk.  See Detention Order Pending Trial at 2, filed July 12, 2016 (Doc. 23)("Detention Order").

Laneham appealed the order.  See Opposed Motion for Review of Order of Detention Pending Trial, filed July 24, 2016 (Doc. 35)("Motion to Review").  He argued that, although he has family in Memphis, Tennessee, he does not present a risk of non-appearance, because he has lived in Albuquerque for almost ten years and has two daughters who also live in Albuquerque.  Motion to Review at 2.  He stated that he works detailing cars.  See Motion to Review at 2.  Laneham also argued that he did not pose a danger to the community, because his current charges suggest that he is, "at most, a street-level drug dealer" whose detention "will do little, if anything to stem the tide of drugs in the community."  Motion to Review at 3.

The Court denied Laneham's Motion to Review, determining that, although it could fashion conditions to mitigate Laneham's danger to the community, Laneham is a flight risk.

See Memorandum Opinion and Order at 1, filed September 2, 2016 (Doc. 45)("Detention Order"). The Court concluded that Laneham's gang connections in Memphis and the drug conspiracy charges suggest that Laneham may be capable of relying on a criminal network to flee Albuquerque. See Detention Order at 14-15. The Court also determined that Laneham does not have any strong ties to the community besides his two daughters and has a history of failing to appear in court. See Detention Order at 15.

A month after the Court denied Laneham's Motion to Review, Laneham's court-appointed attorney, John C. Anderson, moved to withdraw, stating that his relationship with Laneham "ha[d] broken down to the point where there is no longer a functioning or productive attorney-client relationship." Motion to Withdraw as Counsel and for Appointment of New Counsel, ¶ 3, at 2, filed October 5, 2016 (Doc. 52). The Court permitted Mr. Anderson to withdraw. See Order Granting Motion to Withdraw as Counsel and for Appointment of New Counsel, filed October 19, 2016 (Doc. 57). Laneham's next appointed attorney, Amy Sirignano, represented Laneham for seven months before moving to withdraw, explaining that "[a]n irreconcilable breakdown in the attorney-client relationship has occurred." Sealed Motion to Withdrawal [sic] as Counsel, Request for Substitution of Court-Appointed Counsel ¶ 3, at 1, filed May 23, 2017 (Doc. 91). See Order Granting Motion to Withdraw as Counsel and Requests for Substitution of Counsel, filed June 9, 2017 (Doc 95)(allowing Ms. Sirignano to withdraw). Laneham's current counsel, Todd Hotchkiss, was appointed June 12, 2017.

1. **The Motion for Disclosure of Information.**

Laneham filed his Motion on August 8, 2017. In the Motion, Laneham asks the Court to order the United States to provide a variety of documents and information relating to the ATF's sting operations in Albuquerque:

1.     A list of all cases brought by the United States Attorney's Office resulting from the 2016 ATF sting operation conducted in Bernalillo County, New Mexico (hereinafter "ATF sting").

2.     In every ATF sting case:

    A.     Each defendant's race and ethnicity;

    B.     A complete history of each defendant's prior criminal convictions and arrests;

    C.     A statement of the prior criminal investigations, if any, that ATF had conducted into each defendant before initiating confidential informant contact;

    D.     Home address, address of arrest, address of most recent pre-ATF sting convictions, addresses of ATF sting-related approaches, contacts, meetings, or recordings for each defendant;

3.     The same information requested in ¶ 2 for all individuals who were investigated during the ATF sting operation, but who were not ultimately arrested and/or charged;

4.     Any grant proposals or funding requests delineating the purpose and intended effect of the ATF sting operation;

5.     Any policies, practices, or selection criteria which influenced or dictated target selection in the ATF sting cases;

6.     What, if anything, any confidential informant was told about the criteria being used to target individuals in the ATF sting;

7.     The numbers of confidential informants that the ATF used in the ATF sting and the number of those confidential informants who had knowledge of and/or contact with non-African-American or non-Latino persons who could be targeted;

8.     All contemporaneous writings, records, and/or memorializations setting out the reasons the ATF gave for pursuing – or not pursuing – an individual for arrest in the ATF sting;

9.     The charging selection criteria for the ATF sting;

10.     All documents and communications, including all e-mails, memos, text messages, press releases, voicemail messages, audio and video recordings,

between any persons employed or contracted by the ATF, related to: the investigation of any individuals pursuant to the ATF sting; the decision to investigate (or not to investigate) anyone pursuant to the ATF sting; the charging criteria for the AFT sting; the decision to charge (or not to charge) anyone as a result of the ATF sting; the race of any defendant in the ATF sting, and the decision to decline the charging of someone in the ATF sting. Such documents and communications include those made on personally owned devices and/or personally maintained e-mail accounts or social media accounts.

11. All national and Phoenix Field Division ATF manuals, circulars, field notes, correspondence, or any other material which discusses "stings" or entrapment operations, including protocols and/or directions to agents and confidential informants regarding how to conduct such operations, how to determine which persons to pursue as potential targets or ultimate defendants, how to ensure that targets do not seek to quit or leave the conspiracy before an arrest can be made, and how to ensure that agents and confidential informants are not targeting persons for such operations on the basis of their race, color, ancestry, or national origin; and

12. All documents containing information on how supervisors and managers of the Phoenix Field Division ATF were to ensure and/or did ensure that their agents were not targeting persons on the basis of their race, color, ancestry, or national origin for these ATF stings cases, and what actions those supervisors and managers took to determine whether agents were, in fact, targeting persons for those reasons.

Motion at 1-3. Laneham asserts that the ATF's recent sting operations in Albuquerque have led to charges against a disproportionate number of African-Americans: "In a city where African-Americans make up only 3.4 percent of the population, African-Americans represent 26 percent of the defendants charged in the ATF-led sting." Motion at 4. Meanwhile, Laneham asserts, African-American defendants "comprise 5.4% of drug cases and 5.9% of firearms cases" in the District of New Mexico. Motion at 4 (citing DNM statistics).

Laneham argues that United States v. Casanova, CR 16-2917 JAP is similar to Laneham's case: in United States v. Casanova, the defendant, an African-American, arranged for an informant to buy methamphetamine from a white drug dealer; the white dealer was allowed to leave the scene without being arrested, but the defendant was eventually arrested and charged.

<u>See</u> Motion at 5-6.  Laneham argues that <u>United States v. Casanova</u> demonstrates

> all the hallmarks of prior ATF activities, namely an "investigation" which does not involve any actual investigation of prior criminal activity, but rather involves a concocted scenario in which a confidential informant and undercover agent win the trust of someone, arranges a drug transaction, and facilitates the exchange of drugs and money.  It also has one of the key characteristics of ATF operations challenged for racially discriminatory selective enforcement -- wide latitude possessed by agents and informants to target minority populations.  It is this characteristic that best explains the high percentage of African-Americans in the class of defendants arising out of the ATF sting in Albuquerque.

Motion at 6.  Laneham also offers a "history of [the ATF's] racially discriminatory selective enforcement," asserting that journalists' and lawyers' investigations have revealed that "ATF has engaged, consistently and unabashedly, in a pattern of race-based selective enforcement." Motion at 6.

Laneham next argues that the "Constitution prohibits law enforcement from engaging in selective enforcement on the basis of race," and that, to establish a selective enforcement claim, a defendant must show "'the defendant, compared with other[s] similarly situated, was selectively treated[,] and . . . that such selective treatment was based on impermissible considerations such as race.'"  Motion at 8 (quoting <u>Brown v. City of Syracuse</u>, 673 F.3d 141, 151-52 (2d Cir. 2012)).  To obtain discovery related to a selective enforcement claim, Laneham asserts that the defendant "need only show 'some evidence tending to show the existence of the essential elements' of the equal protection defense."  Motion at 8.[6]  Laneham asserts that burden for requesting discovery pursuant to "an equal protection challenge face a lower burden than that required to prevail on the merits."  Motion at 8 (citing <u>United States v. Alameh</u>, 341 F.3d 167, 174 (2d Cir. 2003).  In other words, Laneham argues that, to get discovery, "defendants must provide some evidence that federal authorities have failed to target or prosecute similarly

---

[6]Laneham does not provide a citation, but he appears to be quoting <u>United States v. Armstrong</u>, 517 U.S. 456, 468 (1996)("<u>Armstrong</u>").

situated defendants of other races." Motion at 8.

Laneham then offers evidence. See Motion at 9. He first argues that "[t]he stark difference between the percentage of black defendants in the defendant class and the percentage of African-Americans in the comparison classes would be sufficient on its own to justify the defendant's request." Motion at 9 (citing United States v. Paxton, No. CR. 13-0103, 2014 WL 1648746, at *5 (N.D. Ill. Apr. 17, 2014)(Gettleman, J.)).

Next, Laneham asserts that "[s]everal factors suggest the presence of discriminatory intent." Motion at 9. First, the disproportionate number of African-Americans charged pursuant to the ATF's operation -- in comparison to the percentage of African-Americans living in Albuquerque, or the percentage of African-Americans facing charges in the District of New Mexico -- indicates discriminatory intent. See Motion at 9.

Second, Laneham asserts that the ATF's focus on "areas in Bernalillo County that are comprised predominantly of minority and African-American populations" indicates discriminatory intent. Motion at 9. Third, that the "majority of confidential informants in this case were African-American" indicates discriminatory intent, because using so many African-American informants is "virtually guaranteed to trigger the investigation and prosecution" of other African-Americans." Motion at 9. Fourth, the fact that Laneham was arrested, whereas the "similarly situated" white drug dealer in United States v. Casanova was not, indicates discriminatory intent. Motion at 9. Laneham also notes that the Honorable James A. Parker,

Senior United States District Judge, granted an almost identical motion[7] in <u>United States v. Casanova</u>.[8]  Motion at 11.

## 2.  **The United States' Response.**

The United States responded a few weeks later.  <u>See</u> Response at 1.  The United States begins by arguing that Laneham faces a high burden.  <u>See</u> Response at 2-3.  The United States

---

[7]Laneham's counsel explains:

> Due to the very tight time constraints after undersigned counel's appointment at Mr. Laneham's third attorney, and due to counsel's knowledge that other defense counsel had submitted written requests for the information which counsel seeks in this motion to compel in an effort to develop sufficient facts to establish a claim of selective enforcement and those prior request having been denied by the United States in <u>United States of America v. Casanova</u>, USDNM CR 16-2917 JAP and <u>United States of America v. Lonnie Jackson</u>, USDNM Cr 16-2362 MCA, undersigned counsel submits this motion.

Motion at 10-11.

[8]Judge Parker concluded:

> Defendant need not establish a prima facie case to establish his entitlement to discovery. <u>James</u>, 257 F.3d at 1178. The Court finds that the statistical evidence provided by Defendant constitutes reliable demographic information demonstrating that the operation resulted in a much higher percentage of African-American defendants than the usual rate of occurrence, in the District of New Mexico, of drug and firearm arrests among that group. The Court further finds that the methods used by ATF in conducting this operation were likely to lead to a higher percentage of minority defendants, but that ATF declined to make use of any policies or training designed to counteract that effect. Finally, the Court finds that ATF did not pursue all reasonable avenues in its attempts to identify the white supplier of the methamphetamine for which Defendant was arrested. Consequently, the Court concludes that Defendant has presented "some evidence tending to show the existence of the essential elements of the defense, discriminatory effect and discriminatory intent," <u>Armstrong</u>, 517 U.S. at 468, and is entitled to discovery. However, the Court also finds that the scope of Defendant's request is broader than necessary, and will limit the information that must be disclosed unless the parties are able to reach agreement on the appropriate scope.

<u>United States v. Casanova</u>, No. CR 16-2917 JP, Order Granting Discovery at 4, filed June 12, 2017, (Doc. 57).

asserts that there is a "presumption that state officials are properly effectuating their official duties" and not acting discriminatorily. Response at 2 (citing Armstrong, 517 U.S. at 464). Thus, the United States asserts, defendants seeking to "establish an equal protection claim based on selective law enforcement face a high burden" and must dispel the presumption with "clear evidence to the contrary." Response at 2 (quoting United States v. Hernandez-Chaparro, 357 F. App'x 165, 166 (10th Cir. 2009)). The United States argues that, because a selective prosecution claim is not a defense to the charge's merits, "discovery is only available after certain 'rigorous standard[s]' are met," Response at 2 (quoting Armstrong, 517 U.S. at 468)(alteration by the United States), and the requirements for obtaining selective prosecution-related discovery "are essentially the same as those need[ed] to establish selective prosecution," Response at 2 (citing United States v. James, 257 F.3d 1173, 1178 (10th Cir. 2001)).

The United States argues that a defendant must "make a credible showing" that: (i) the "'federal prosecutorial policy had a discriminatory effect'"; and (ii) that it was "'motivated by a discriminatory purpose.'" Response at 3 (quoting Armstrong 517 U.S. at 470). The United States asserts that "'[g]eneralized allegations of improper motive' are not enough," Response at 3 (quoting Wade v. United States, 504 U.S. 151, 186 (1992)), and that the defendant must provide "some evidence that similarly situated defendants of other races could have been [arrested], but were not," Response at 3 (quoting Armstrong at 469-70). The United States also recognizes that the "credible showing" requirement may be made by "identifying a similarly-situated individual or through the use of statistical evidence." Response at 3 (quoting United States v. James, 257 F.3d at 1179).

Next, the United States addresses Laneham's evidence for discriminatory effect. See Response at 3-8. The United States begins by acknowledging that Judge Parker "found recently

that population statistics were a sufficient basis upon which to find a discriminatory effect," but that the United States does not agree with that ruling. Response at 3-4. For starters, the United States asserts that it is "unrealistic to expect the criminal enforcement operation to mirror the city's population density by race" because "an [ATF] operation . . . is not random, and . . . has a thousand variables, including . . . economic factors; the percentage of African-Americans, Hispanics and whites in the targeted quadrant of the city; the propensity of certain races to be arrested more often for certain crimes and a thousand other factors." Response at 4. Given those factors, the United States asserts, for a law enforcement operation to mirror the city's total population demographics, "the agency running the enforcement operation would have to establish quotas for defendants by race." Response at 4. Under such a quota-based approach, the United States imagines, ATF agents, once they realized Laneham was African-American, would have to check their quota numbers to determine whether they had arrested too many African-Americans already, and thus potentially allow Laneham to go free "even though they did not target him for arrest, did not know he was black, and [only] became a target for arrest . . . after he showed up at the scene of the undercover drug transaction . . . with the drugs." Response at 4.

As for the DNM statistics, the United States argues that statistics on defendants' race "does not even constitute 'some' evidence of discriminatory effect," because it includes race data for crimes like antitrust prosecutions and wildlife crimes that "mean[] nothing in the context of the [ATF] operation, which targeted drug and firearms offenses." Response at 4.

Turning to Laneham's evidence of discriminatory motive, the United States asserts that, for him to prevail, "the agents had to either select or reaffirm[] a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group."

Response at 5 (citing <u>Wayte v. United States</u>, 470 U.S. 598 (1985)).  The United States argues that Laneham has to show that the ATF acted with discriminatory purpose "'specific **to his own case** and must support an interference that racial considerations played a party in **his** treatment." Response at 5 (quoting <u>United States v. Duque-Nava</u>, 315 F. Supp. 2d 1144, 1161 (D. Kan. 2004)(Robinson, J.)(emphasis added by the United States)).  The United States argues that Laneham has not offered any evidence of discriminatory intent "especially when confined to the facts of his own case."  Response at 5.  The United States contends that the "ATF did not target Laneham; they did not know he was black; they did not know who he was."[9]  Response at 5.  The United States characterizes Laneham's "theory [as being] that when he showed up to sell drugs to the undercover agent at the invitation of a co-defendant, upon realizing that he was black, the agents should have just ignored him and searched for a white defendant to arrest." Response at 5.

The United States further assert that Laneham's statistical evidence is offered "without context" and is insufficient to show discriminatory intent.  Response at 5-6.  The United States contends that statistics indicating a discriminatory pattern have rarely been found to demonstrate a constitutional violation, <u>see</u> Response at 6 (citing <u>Blackwell v. Strain</u>, 496 F. App'x 836, 840 (10th Cir. 2012), and that the statistics must be focused and demonstrate meaningful correlations, <u>see</u> Response at 6 (citing <u>Harris v. United States</u>, 536 U.S. 545, 562 (2002); <u>United States v. Alabi</u>, 597 F. App'x 991, 997 (10th Cir. 2015); <u>United States v. Rodella</u>, 59 F. Supp. 3d 1331, 1353 (D.N.M. 2014)(Browning, J.)).  Specifically, the United States argues that courts "cannot presume that all people of all races commit the same crimes with the same frequency."

_____

[9]In the Evidentiary Hearing, the United States' counsel, Mr. Cairns, acknowledged that the ATF did know about Laneham before they allegedly observed him participating in a drug transaction.  <u>See</u> 19:10-15 (Cairns, Johnson); Tr. at 61:19-62:3 (Cairn, Johnson).

Response at 6 (citing <u>Armstrong</u>, 517 U.S. at 469). In other words, the United States contends that showing discriminatory intent with statistics requires "(1) reliable demographic information; (2) some manner of determining whether the data represents similarly situated individuals; (3) information about the actual rate of occurrence of the suspected crime against relevant racial groups," Response at 7 (citing <u>United States v. Alabi</u>, 597 F. App'x at 997), and "Laneham's data has none of these attributes," Response at 7.

The United States also denies that the ATF's use of mostly African-American CIs necessarily leads to African-American defendants because, if African-American CIs only interacted with other African-Americans, then "more than 25 percent of the defendants should have been African-American." Response at 7.

Additionally, the United States argues that Laneham cannot make a credible showing that similarly situated people of another race could have been arrested, but were not arrested, because he offers only the story of the white drug dealer from <u>United States v. Casanova</u>, and, moreover, the ATF did not arrest the white drug dealer, because it never managed to identify or locate him. <u>See</u> Response at 8-9. The United States acknowledges, however, that, "when held to a standard of perfection, there were options available to ATF that might have identified him, but there is nothing to indicate that the failure to do so was based on race." Response at 9.

3.    **The Reply.**

Laneham replied in September, 2017. <u>See</u> Defendant's Reply to United States' Response to Defendant's Motion for Disclosure of Information, filed September 11, 2017 (Doc. 119) ("Reply"). Laneham begins by asserting that the United States "does not appear to dispute that the legal standard required . . . to obtain discovery pertaining to a claim of selective enforcement is 'some evidence tending to show the existence of the essential elements of . . . discriminatory

effect and . . . intent.'"  Reply at 1 (quoting <u>Armstrong</u>, 517 U.S. at 568).  Laneham argues that <u>Armstrong</u> "intended to leave open a mechanism whereby a criminal defendant with cognizable claim of selective prosecution -- or, in this case, selective enforcement -- could obtain discovery."  Reply at 2.

Laneham contends that the United States "repeatedly conflates" the standard for proving an equal-protection claim with the standard for obtaining discovery supporting such a claim. Reply at 2.  Additionally, Laneham argues that the standard for obtaining discovery for a selective enforcement claim is lower than for obtaining discovery for a selective prosecution claim.  <u>See</u> Reply at 3.  Laneham asserts that, although the United States cites <u>United States v. James</u>, 257 F.3d at 1178, for the proposition that those standards are equal, Laneham "could find no such holding" in the case, Reply at 3.

Laneham argues that the "presumption of regularity" discussed in <u>Armstrong</u> "refers only to prosecutorial decisions" and "does not extend to ATF law enforcement agents [or their] confidential informants."  Reply at 4-5.  Consequently, Laneham argues, the standard for obtaining discovery for a selective enforcement claim is lower than for a selective prosecution claim, because there is no "presumption of regularity" to overcome.  Reply at 3.  Laneham contends that the United States Court of Appeals for the Tenth Circuit's decision in <u>United States v. Hernandez-Chaparro</u>, 357 F. App'x 165, does not show that the two standards are equal, because: (i) that case addresses the merits of dismissal based on selective enforcement and not an order of discovery; and (ii) the Tenth Circuit "inserts the words 'law enforcement official' [when discussing the presumption of regularity] where the <u>Armstrong</u> Court used the word 'prosecutor,' without providing any reasoning for why this interchange would be appropriate."  Reply at 3 (quoting <u>United States v. Hernandez-Chaparro</u>, 357 F. App'x at 166; <u>Armstrong</u>, 517 U.S. at

465).  A closer reading of <u>Armstrong</u>, Laneham contends, demonstrates that the Supreme Court of the United States envisioned the presumption as applying to prosecutors, but not law enforcement officials.  <u>See</u> Reply at 4 (citing <u>Armstrong</u>, 517 U.S. at 464).  Moreover, Laneham asserts, the United States Court of Appeals for the Seventh Circuit concluded that the ATF and the FBI agents are not "covered by a presumption of constitutional behavior," and that the "sort of considerations that led to the outcome in <u>Armstrong</u> do not apply" when a defendant asserts that FBI or ATF agents "engaged in racial discrimination when selecting targets for sting operations, or when deciding which suspects to refer for prosecution."  Reply at 4 (quoting <u>United States v. Davis</u>, 793 F.3d 712 (7th Cir. 2015)).

Laneham notes that the discovery standard is "rigorous," and that the defense must produce "'some evidence tending to show the existence of the essential elements of the defense, discriminatory effect, and discriminatory intent.'"  Reply at 3 (quoting <u>Armstrong</u>, 517 U.S. at 464).  Laneham adds that, in "most ordinary cases," such a showing would be "nearly impossible," but the "Albuquerque ATF sting cases are out of the ordinary."  Reply at 3.

Laneham asserts that the evidence of past ATF operations "is highly relevant circumstantial evidence that may be used to infer intent, particularly where many of the agents involved in prior sullied operations were also involved in the Albuquerque sting that led to Mr. Laneham's arrest."  Reply at 5.  Laneham argues that the ATF agent testimony in <u>United States v. Casanova</u> demonstrates that the ATF agents knew that their approach had led to a large number of minorities being arrested, but that this outcome had "no effect" on how they operate.  Reply at 5 (quoting <u>United States v. Casanova</u>, 16-CR-2917 JP, Russell Transcript of Hearing at 96:25-97:14 (ATF Special Agent Russell Johnson), taken April 5, 2017, in (Doc. 51)).

Laneham then makes his case for why the discovery will help Laneham understand the

ATF's choice to focus on a particular Albuquerque region: "Understanding of the ATF's targeting criteria will enable a defense expert to construct a precise similarly situated comparison group and run statistical analyses of the defendant class against this group."  Reply at 6.

Laneham next addresses the statistical evidence that he has submitted to the Court.  See Reply 6-7.  First, Laneham asserts that the term "similarly situated" has many definitions.  Reply at 7.  The United States Court of Appeals for the First Circuit that held that a "'similarly situated offender is one outside of the protected class who has committed roughly the same crime under roughly the same circumstances but against whom the law has not been enforced.'"  Reply at 7 (quoting United States v. Lewis, 517 F.3d 20, 25 (1st Cir. 2008)).  The United States Court of Appeals for the Fourth Circuit described "similarly situated" defendants as ones whose "'circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them.'"  Reply at 7 (quoting United States v. Olvis, 97 F.3d 739, 744 (4th Cir. 1996)).  The United States Court of Appeals for the Eleventh Circuit defines "similarly situated" individuals as those who engage in the same of conduct or crime such that prosecution of each would have the "same deterrence value and would be related in the same way to the Government's enforcement priorities and enforcement plan," and where there is comparable evidence strength against each.  Reply at 8 (quoting United States v. Smith, 231 F.3d 800, 810 (11th Cir. 2000)).  Laneham argues that the Eleventh Circuit's comparable evidence standard would apply to selective enforcement by considering "where and how law enforcement searches for that offender."  Reply at 8.

Laneham asserts he has provided data on similarly situated individuals because the DNM statistics shows demographic information for defendants facing drug and gun charges in New Mexico.  See Reply at 9.  Laneham contends that comparing those figures with the race statistics

for defendants caught in the ATF sting reveals a "great disparity": African-Americans comprise 5.4% of federal drug trafficking offenses and 5.9% of federal firearms offenses in the District of New Mexico, while the ATF sting brought in 27.2% African-American defendants.  Reply at 9.

Laneham contends that the demographic statistics for the Bernalillo County, State of New Mexico,[10] also provide a similarly situated comparison group.  See Reply at 9.  Laneham writes:

> Given the fact that ATF 1) had no discernable criteria for selecting the area of the city it chose to focus on and 2) had no discernable criteria for selecting its targets, one could conceivably argue that the entirety of Bernalillo County could have been subject to being targeted by the ATF.  In that event, the benchmark against which to judge the 27.2% figure would be the 3.4% composition of Blacks in Bernalillo County, creating an even greater disparity for the government to explain.

Reply at 9.

Laneham argues that, in United States v. Casanova, the ATF chose not to arrest a white drug dealer, but, here, the ATF chose to arrest Laneham, despite both being allegedly comparably culpable; Laneham argues that this difference reveals a discriminatory effect.  See Reply at 9.

Finally, Laneham concludes by explaining that "[r]eceiving discovery will enable Mr. Laneham to construct a precise similarly-situated comparison group and present testimony by an expert subject to cross-examination regarding the accuracy of that comparison group."  Reply at 12.

### 4.     The Hearing.

The Court held a hearing on October 4, 2017.  See Tr. at 1.  The United States began by bringing Special Agent Russell Johnson to the stand.  See Tr. at 2:20-23.  Johnson stated that he

---

[10]The city of Albuquerque is within Bernalillo County.  See Overview of Bernalillo County, New Mexico, https://statisticalatlas.com/county/New-Mexico/Bernalillo-County/Overview (last visited October 18, 2017).

is an ATF Special Agent and that he was involved in an ATF operation in Albuquerque known as the Surge. See Tr. at 3:1-12 (Cairn, Johnson). Johnson explained that the Surge was a four-month operation in which "ATF brought in undercovers and confidential informants into the city of Albuquerque to combat violent crime." Tr. at 3:15-18 (Johnson). Johnson stated that the ATF chose to target Albuquerque because of its high crime rate. See Tr. at 4:11-22 (Johnson). Johnson stated that, having chosen Albuquerque, the ATF consulted with the Albuquerque Police Department, the Bernalillo County New Mexico Sheriff's Office, the United States Attorney's Office, the United States Marshal Service, the Drug Enforcement Administration, and other ATF agents. See Tr. at 5:4-11 (Johnson). Based on those consultations, the ATF determined that "the most violent part of Albuquerque was the southeast quadrant." Tr. at 5:11-14 (Johnson).

Johnson described how the ATF conducted its Albuquerque operations. See Tr. at 8:24-10:12. First, they sent CIs -- who were not from Albuquerque -- into southeast Albuquerque. See Tr. at 8:11-14 (Johnson). Johnson continued:

> A. The confidential informants were instructed to try to meet individuals that stated they were engaged in violent crime. Once the CIs would meet somebody they'd provide the information to us, we would then vet that information and then, if it was worth acting on, we would [try] to set up a transaction where we would corroborate CIs information -- a CI stated this individual says he sells meth or if the individual sells guns, we'd [set up an] undercover transaction where one of our undercover agents along with the CI would go meet with the individual.

> Q. And when you say [there] was a decision-making process as to which individuals to pursue and not pursue, how did that decision process work?

> A. The agents that were assigned to the operation . . . would look at all known factors, known criminal history, criminal reputation of the individual, [and] intelligence received from the Albuquerque Police Department. There [were] several variables, [but] there wasn't a set in stone criteria that it had to check these 3 boxes. It was just based on the information known at the time.

> . . . .

> Q. [I]f someone appears during the operation itself . . . that was previously

unknown to ATF, or had not previously been identified as a target, could that person become a target based on their appearance in the operation and the action that is they committed after they were involved?

A.  Absolutely, because this operation had no targets when we got here.  [H]ow we operate [is for] the confidential informant [to] go out and meet individuals. The individuals tell them, again, I sell drugs, I sell guns and we go out and verify that through undercover purchases, intelligence received from APD, so we did not have a target list.  So the targets that we had during this operation were targets that were generated very fluidly where one day a confidential informant might meet somebody and by the end of that day we've met with that individual and made a purchase from them. . . .  And when we did have a known target and we went to meet with them, it was very common for that target to then introduce to us somebody that we didn't know at the time.  Of our cases, 26 of the cases were multidefendant cases, which led to approximately 75 percent of our arrests.  75 individuals roughly were arrested in multidefendant cases, meaning that the first individual we met would then take to us a second individual, possibly a 3rd or 4th individual.

Tr. at 6:25-10:3 (Cairns, Johnson).  Norman Cairns, Assistant United States Attorney, then asked Johnson whether, in his experience, "individuals of the same race participate in the same conspiracies," and Johnson answered that Albuquerque was "unique" in that "[t]here were a lot of individuals [for whom] race lines didn't matter, where we might meet a white individual who introduces us to a black individual, or a Hispanic individual who introduced us to a white individual."  Tr. at 11:19-12:9 (Cairns, Johnson).

Mr. Cairns then asked whether the ATF considered a person's race as a factor when deciding whether to "target" that person, and Johnson replied: "Absolutely not."  Tr. at 13:9-14 (Cairns, Johnson).

Next, Johnson considered Albuquerque's demographics, and stated: "I don't believe that the numbers that you can get off Google or through the census accurately reflect what is in the city."  Tr. at 14:20-23 (Johnson).  Johnson mentioned the Memphis Mob, a gang based in Tennessee but who have members operating in Albuquerque, and stated that "if we queried them to find out where they live, it [would] still show a Memphis, Tennessee address," and they would

be unlikely to participate in a census that would reflect their presence in Albuquerque. Tr. at 14:10-15:5 (Cairns, Johnson).

Mr. Cairns then asked whether Johnson believed that, if one considered a particular conspiracy's demographics, those demographics would be proportional to the demographics of the city at large, and Johnson said no. See Tr. at 15:6-14 (Cairns, Johnson).

Mr. Cairns then returned to the ATF's decision to focus on southeast Albuquerque, asking whether the ATF considered "factors such as socioeconomic status or race," and Johnson answered: "No, it was solely based on violent crime and what the agencies that were actually patrolling those areas and working those areas and getting dispatched to those areas stated the most violent areas were." Tr. at 15:24-16:8 (Johnson).

Johnson stated that he first learned of Laneham when the ATF discovered that some members of the Memphis Mob were currently operating in Albuquerque, and, according to police records and investigators, that Laneham was one of the "highest ranking [Memphis Mob] members . . . still in Albuquerque." Tr. at 17:1-22 (Johnson). They were not, however, actively looking for Laneham. See Tr. 19:24-25 (Johnson).

The ATF learned that another high-ranking Memphis Mob member was opening a smoke shop, and they sent a CI to make connections into the Memphis Mob. Tr. at 19:3-8 (Johnson). Johnson asserted that the CI met a man there named Devell Devoual who said that he could sell the CI methamphetamine and gave the CI his telephone number. See Tr. at 22:18-22 (Johnson). Johnson recounted that an undercover agent called Devoual to arrange a purchase, and, on May 17, 2017, the undercover agent and Devoual met at a 7-Eleven parking lot. See Tr. at 24:6-9 (Johnson). The undercover agent, Devoual's vehicle, and another vehicle -- a Mitsubishi Gallant -- drove to a nearby street. See Tr. at 24:10-13 (Johnson). Johnson described what

happened next:

> Devoual again exited his vehicle, got into the white Gallant, exited the white Gallant, [and] motioned for the undercover to come over. The undercover [agent] then goes and gets in the back seat of the white Gallant, where he immediately sees Cedric Laneham as the driver. Mr. Laneham then handed the undercover a scale and a white plastic bag which contained a substance he recognize to do be methamphetamine. The undercover weighed the methamphetamine with the scale provided by Mr. Laneham, the undercover and Devoual then paid Mr. Laneham for the methamphetamine. The undercover also observed in Mr. Laneham's lap a black handgun. The undercover then exited the vehicle and the departed location.

Tr. at 24:9-25:2 (Johnson). Johnson explained that he did not expect Laneham to be a part of the transaction with Devoual. See Tr. at 17:8-17 (Johnson). Johnson asserted that the next day, May 18, 2017, he reviewed Laneham's "entire criminal history and learned that he had at least six felony convictions, at least three aggravated assault arrests, [and] numerous drug traffic arrests." Tr. at 21:7-11 (Johnson).

Mr. Cairns asked Johnson to "lay out all the factors regarding Mr. Laneham that would make him interesting to you as a target," and Johnson replied: "Known felony convictions, three possessions of controlled substance, felon in possession of a firearm, aggravated assault, and possession of weapon by a prisoner." Tr. at 30:12-18 (Cairns, Johnson). Mr. Cairns then asked whether there was anybody else, of any race, that Johnson encountered that had a similar criminal history, level of participation in a drug sale, and a leadership role in a gang that the ATF decided not to pursue, and Johnson answered: "Absolutely not." Tr. at 31:10-24 (Cairns, Johnson).

Todd Hotchkiss, Laneham's attorney, then began cross-examining Johnson. See Tr. at 32:11. Mr. Hotchkiss began by asking Johnson why he thought that Memphis Mob members would not participate in a census, and Johnson replied that people who "are trying to possibly conceal where they actually reside if they're in an area to further criminal enterprise would not

take part in the census survey," but denied saying that all members of the  Memphis Mob would definitely not participate in a census.  Tr. at 32:12-33:10 (Hotchkiss, Johnson).  Mr. Hotchkiss asked how many undercover agents and CIs the ATF used in the Surge, and Johnson stated that there were five CIs and nine primary undercover agents, plus some additional agents brought for "different roles and different functions."  Tr. at 34:16-35:5 (Hotchkiss, Johnson).  Mr. Hotchkiss asked how many of the five CIs and nine primary undercover agents were African-American, and Johnson said that there were three African-American CIs and one African-American undercover agent.  See Tr. at 35:6-12 (Hotchkiss, Johnson).

Mr. Hotchkiss then recalled how Johnson had testified earlier that the people the undercover agents and CIs encountered in southeast Albuquerque were willing to deal with people of different races, and asked Johnson whether he knew that fact about Albuquerque before the Surge began.  See Tr. at 35:21 (Hotchkiss).  Johnson said that he did not know or hear anybody talk about that reality. See Tr. at 35:22-36:16 (Johnson).  Mr. Hotchkiss asked if the ATF operated outside of the Albuquerque's southeast quadrant, and Johnson replied that, although they focused on the southeast quadrant, they also did work in Albuquerque's southwest and northwest quadrants, and even outside of Albuquerque.   Tr. at 36:25-37:9 (Hotchkiss, Johnson).

Mr. Hotchkiss asked whether it is possible "that these CIs may have had some private agendas of their own in selecting who to talk to and where they went."   Tr. at 19:14-16 (Hotchkiss).  The question led to the following exchange:

> A.  Yes, it is possible that these CIs had their own private agendas in deciding who to talk to and where to go, but I don't know what they would have to gain from talking to certain individuals because they know that if they aren't producing . . . targets that there are other CIs that could come in to take their place and that their phone calls and text messages are documented and that we will corroborate through undercover meetings and transactions.  When we go meet a

new target we might ask the guy, hey what did the CI tell you just so we know exactly what has been discussed.

Q. Well a CI may deem in their mind . . . righteous target[s] [to be] all African-American people, correct?

A: I don't think any of our CIs targeted all African-American people and I think based on the sheer numbers of the approximately 110 including the state defendants that if they targeted only African-Americans that the numbers would be a lot higher.

Q. Let me change my question. A CI could have disproportionately targeted African-Americans because of that CIs own private agenda, correct?

A. I don't believe that's the case.

Q. But you didn't know?

A. I think that if there was something nefarious with who they were trying to target, that we would have seen that through the phone numbers that they're giving us and the individuals that we're identifying that they've met.

Tr. at 40:4-41-8 (Hotchkiss, Johnson).

Mr. Hotchkiss asked whether the ATF has "any kind of tactical plan or guidelines written for use of the CIs and for administering this operation," or if the ATF "kept track of the race of people that any of the CIs were contacting," and Johnson answered that they did not keep such records. Tr. at 44:7-23 (Hotchkiss, Johnson). When Mr. Hotchkiss asked Johnson if he was "at any time concerned that the CIs were disproportionately contacting African-Americans," and Johnson answered: "No." Tr. at 44:24-45:1 (Hotchkiss, Johnson). Johnson asserted that he has "worked all the CIs previously and [has] never seen any sort of bias from any of them." Tr. at 45:22-23 (Johnson).

Mr. Hotchkiss then asked whether the ATF kept any records of how many people they could have pursued but did not, and what the races of those people were, and Johnson said that they did not keep such records and he did not have any idea of what those numbers would be.

See Tr. at 46:17-47:10 (Hotchkiss, Johnson).

Mr. Hotchkiss then showed Johnson a spreadsheet listing the names and races of 103 Surge defendants. See Tr. at 48:10-11. Mr. Hotchkiss asked if the spreadsheet looked accurate, and Johnson said that one defendant, Gonzalo Revet, is identified as black, but, Johnson asserted, "I would list him as Hispanic."[11] Tr. at 48:23-49:4 (Hotchkiss, Johnson).

Next, Mr. Hotchkiss began asking Johnson about United States v. Casanova. See Tr. at 51:3. Johnson explained that he and a CI met with Casanova in a 7-Eleven parking lot to purchase a shotgun and methamphetamine. See Tr. at 52:8-53:18 (Johnson). Casanova sold Johnson a shotgun, and Casanova explained that someone else would be arriving to deliver the

---

[11]In United States v. Casanova, Johnson considered an earlier version of the same spreadsheet and expressed the same view that Revet should be listed as Hispanic and not black. See Casanova Tr. at 69:16 (Johnson). That assertion led to the following exchange between Johnson and Casanova's counsel, Brian Pori:

Q. He is not black?

A. He's Cuban.

. . . .

Q. What is the appearance of Mr. Revet?

A. He's dark complected, but I can't speak to what Gonzalo Revet's parents were, what their ethnicity [was]. I know he's a Cuban male. He does not speak English, and I know he's from Cuba.

. . . .

Q. If we didn't know Mr. Revet's lineage, he would be appear to be a black man?

A. Yes.

Q. And so dark he appears to be black?

A. That's subjective.

Casanova Tr. at 69:16-70:16 (Pori, Johnson).

methamphetamine.  See Tr. at 53:21-25 (Johnson).  Eventually, a car arrived and an unidentified white male exited the passenger seat and delivered a bag of what appeared to be methamphetamine.  See Tr. at 53:1-11 (Johnson).  The ATF did not arrest either Casanova or the white male.  See Tr. at 53:12-19 (Johnson).  Despite recording and running the license plate number of the car carrying the white male, the ATF was unable to identify the white male.  See Tr. at 54:8-11 (Johnson).

Mr. Hotchkiss sought to draw comparisons between the white male's role in the Casanova transaction and Laneham's alleged role in the Devoual transaction:

Q.   [One transaction involves] an unidentified white male delivering meth and [the other involves] Mr. Laneham delivering the meth?

A.   In the sense that Mr. Laneham and [the white male] arrived after the deals had already been started, there are similarities there, but it stops there.

Q.   Okay [but] they [both] arrive with meth was used in the transactions?

A.   Yes but it's unknown if [the white male] had received the methamphetamine from the driver because we weren't privy to that conversation [and] we cannot see inside his vehicle [but] we know Mr. Laneham was in his vehicle by himself . . . . [And he had] a scale indicative of trafficking and two ounces methamphetamine and also had a firearm on him.  When [the white male] walked past me all I could see was that he had a bag of meth in his hand but I don't know what conversation happened in his vehicle [or] if he was the one that Casanova had communicate[d] with . . . or if there were a third vehicle I couldn't see, [or] any other occupants in the vehicle.  We now he got out to front passenger's side.  And it's unknown if Mr. Laneham got this meth from somebody else.  If he did it wasn't in our presence.  When he arrived at the location, Mr. Laneham was by himself.

Tr. at 55:24-56:25 (Hotchkiss, Johnson).

Mr. Hotchkiss then asked about ATF's efforts tracking down the unidentified white male:

Q.   You pulled up a photograph of the person who belongs to the license plate on the car, correct?

A.   Yes, but that is not always indicative of who is in control of the car, who actually owns the car. . . . [T]o run a query of his license plate wouldn't tell us accurately who is driving yet or who is in control of that vehicle.

. . . .

Q.  And nobody went and spoke to the registered owner of vehicle?

A.  No.

Q.  And no one ever spoke to anyone identified through the investigation of the license plate?

A.  No.

Q.  So you looked at some photographs back at the office to try and find out who the white male was?

A.  We tried to find people associated with the vehicle as well as people associated with Mr. Casanova, as well as when Mr. Casanova was arrested the following month, looking at photos of the people that he was arrested with at that time, and again unsuccessful when we're attempting to identify [the unidentified white male].

Q.  So while you tried to, I think you just testified about trying to talk to people associated with the vehicle, but you never did, correct?

A.  And say that we tried to talk to them, we looked at pictures and photos and tried to find associates that were tied to the vehicle through law enforcement databases or tied to Mr. Casanova.

Q.  But not to the plate?

A.  No.

Q.  Or to the registered owner?

A.  Correct.

Tr. at 57:1-58:23 (Hotchkiss, Johnson).  On redirect, Mr. Cairns asked Johnson to speak more

about their handling of the unidentified white male, and Johnson stated:

We had very little to go off of.  And in regards to the questions about did we conduct any interviews -- again we had an operation going with confidential informants who were still actively working as well as undercovers so right after the transaction occurred we couldn't go out and be overt [by] trying to interview the registered owners.  Just the operational security issue of that would have put people in danger.

Tr. at 62:4-18 (Johnson).

The Court then asked Mr. Hotchkiss to argue for his motion. <u>See</u> Tr. at 63:19-20 (Court). Mr. Hotchkiss stated that Laneham has submitted statistical evidence that twenty-seven percent of the Defendants whom the ATF arrested in the Surge operation are African-American, while only 3.4 percent of Albuquerque's population is African-American. <u>See</u> Tr. at 64:2-6 (Hotchkiss). The Court noted that, according to the DNM Statistics chart, 88.9 percent of District of New Mexico offenders between 2006 and 2015 are Hispanic. <u>See</u> Tr. 64:7-13 (Court). Given that Hispanics do not comprise 88.9 percent of New Mexico's population, the Court expressed skepticism that offender rates that are disproportionate to a region's demographics necessarily indicate racism is the cause. <u>See</u> Tr. at 65:7-12 (Court).

The Court then asked Mr. Hotchkiss what Laneham plans to do with the discovery, if the Court grants it, and Mr. Hotchkiss answered that Laneham would fashion a motion to dismiss. <u>See</u> Tr. at 65:18-66:9 (Court, Hotchkiss). The Court asked what Laneham's "dream find" in the requested discovery would be, and Mr. Hotchkiss answered that he could not say for sure, but some kind of "acknowledgment of differential treatment of similarly situated people." Tr. at 72:1-7 (Court, Hotchkiss).

The United States returned to the podium and stated that the District of New Mexico's high rate of Hispanic defendants is likely a reflection of immigration-related offenses. <u>See</u> Tr. at 74:8-9 (Cairns). The Court replied that the rate is similarly disproportionally high for Hispanics in drug trafficking cases. <u>See</u> Tr. at 74:12-14 (Court). Given those rates, the Court reasoned that "it seems to me to be a little bit of a dangerous slope to start going down just counting up the race of the defendants in a multidefendant case or operation and say well, because that doesn't match that chart, that we have proven <u>Armstrong</u>'s initial threshold requirement." Tr. at 74:15-

22 (Court). The United States agreed, asserting that "all statistical evidence can be interpreted in different ways." Tr. at 76:1-5 (Cairns). Mr. Cairns added that the Court should "take into consideration . . . the nature of conspiracy where defendants can be tied together in conspiracy where it's not as now we're simply drawing names or numbers out of a hat and saying this needs to produce a random sample that reflects the overall population." Tr. at 77:10-15 (Cairns).

The United States then disputed that the unidentified white male was similarly situated to Laneham, because the ATF knew a lot about Laneham's "criminal history and leadership role within the Memphis Mob," and Laneham "directly [sold] narcotics to the undercover agent." Tr. at 81:14-24 (Cairns). The United States argued that, even if the Court agrees with Judge Parker's reasoning "and say that the result of the Surge has to mathematically match the census," Laneham's Motion must still fail because there [is] no evidence of discriminatory intent. Tr. at 82:10-20 (Cairns). The United States then acknowledged that, given Judge Parker's order for the United States to produce discovery to the United States v. Casanova defendant, Laneham will likely have access to those discovery materials. See Tr. at 82:20-83:8 (Cairns).

The United States then argued that, in the "rare occasions in which the courts have held that statistical evidence is enough" to demonstrate discriminatory intent, the statistical evidence was overwhelming. Tr. at 85:5-20 (Cairns)(referencing Yick Wo v. Hopkins, 118 U.S. 356 (1886), and Gomillion v. Lightfoot, 364 U.S. 339 (1960)). The United States asserts that twenty-five percent of the Defendants are black is "not anywhere close" to the overwhelming statistical evidence in Yick Wo v. Hopkins and Gomillion v. Lightfoot. Tr. at 86:1-5 (Cairns).

The Court gave the final word to Laneham. See Tr. at 87:6. Laneham pushed back on the idea that Laneham and the unidentified white male are not similarly situated, asserting that it should not matter that they may not have had the same criminal history; the critical factor is that

"they each allegedly committed roughly the same crime under roughly the same circumstances." Tr. at 87:9-22 (Hotchkiss).

The Court then stated that it is inclined to conclude that Laneham has not presented adequate evidence indicating discriminatory effect and intent. See Tr. at 87:25-88:4 (Court).

## LAW REGARDING A RACIALLY SELECTIVE LAW ENFORCEMENT CLAIM

"'[T]he Equal Protection Clause of the Fourteenth Amendment provides citizens a degree of protection independent of the Fourth Amendment protection against unreasonable searches and seizures.'" Marshall v. Columbia Lea Reg'l Hosp., 345 F.3d 1157, 1166 (10th Cir. 2003)(quoting United States v. Avery, 137 F.3d 343, 352 (6th Cir. 1997)). In the civil context, the Tenth Circuit has recognized that "claims asserting selective enforcement of a law on the basis of race are properly brought under the Equal Protection Clause, and that the right to equal protection may be violated even if the actions of the police are acceptable under the Fourth Amendment." Marshall v. Columbia Lea Reg'l Hosp., 345 F.3d at 1166. A racially selective law enforcement claim exists where the government conduct had a discriminatory effect and where a discriminatory purpose motivated the conduct. See Marshall v. Columbia Lea Reg'l Hosp., 345 F.3d at 1168 ("The requirements for a claim of racially selective law enforcement draw on what the Supreme Court has called 'ordinary equal protection standards.' The plaintiff must demonstrate that the defendant's actions had a discriminatory effect and were motivated by a discriminatory purpose." (quoting United States v. Armstrong, 517 U.S. at 465)). "The discriminatory purpose need not be the only purpose, but it must have been a motivating factor in the decision." Marshall v. Columbia Lea Reg'l Hosp., 345 F.3d at 1168 (citing Villanueva v. Carere, 85 F.3d 481, 485 (10th Cir. 1996)). "Statistical evidence can be used to show both discriminatory effect and discriminatory purpose." Blackwell v. Strain, 496 F. App'x at 839-40

(citing Marshall v. Columbia Lea Reg'l Hosp., 345 F.3d at 1168). The Tenth Circuit has recognized that proving discriminatory intent in this context is a high bar, and cases in which this bar is met are rare:

> Statistical evidence alone is rarely enough to show discriminatory purpose. Although the Supreme Court "has accepted statistics as proof of intent to discriminate in certain limited contexts," only in "rare cases [has] a statistical pattern of discriminatory impact demonstrated a constitutional violation." McCleskey v. Kemp, 481 U.S. 279, 293 & n.12 . . . (1987); Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 266 . . . (1977)("Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action. . . . But such cases are rare."). This is because, to prevail on an equal protection claim, a plaintiff "must prove that the decisionmakers in *his* case acted with discriminatory purpose." McCleskey, 481 U.S. at 292 . . . . Examples of "those rare cases in which a statistical pattern of discriminatory impact demonstrated a constitutional violation" include Gomillion v. Lightfoot, 364 U.S. 339, 340-41 . . . (1960), and Yick Wo v. Hopkins, 118 U.S. 356, 373-74 . . . (1886). McCleskey, 481 U.S. at 293 n.12 . . . . In Gomillion, the Supreme Court held a state legislature violated the Fifteenth Amendment when it altered a city's boundaries "from a square to an uncouth twenty-eight-sided figure," thereby excluding 395 of 400 black voters without excluding a single white voter. 364 U.S. at 340-41 . . . . The Court held that "the conclusion would be irresistible, tantamount for all practical purposes to a mathematical demonstration" that the state acted with a discriminatory purpose. Id. at 341 . . . . In Yick Wo, an ordinance required laundry operators to obtain a permit, and all but one of the white applicants received permits while none of the over 200 Chinese applicants received permits. 118 U.S. at 373-74 . . . . The Court determined that the statistical disparity "warrant[ed]" and "require[d] the conclusion" the state acted with a discriminatory purpose. Id. "Absent a pattern as stark as that in Gomillion or Yick Wo," however, "impact alone is not determinative, and the Court must look to other evidence." Vill. of Arlington Heights, 429 U.S. at 266 . . . (footnote omitted); see also Chavez v. Ill. State Police, 251 F.3d 612, 647–48 (7th Cir. 2001).

Blackwell v. Strain, 496 F. App'x at 840.

In the context of a 42 U.S.C. § 1983 claim, the Tenth Circuit in Marshall v. Columbia Lea Reg'l Hosp. noted:

> To withstand a motion for summary judgment, a plaintiff in a § 1983 suit challenging alleged racial discrimination in traffic stops and arrests must present evidence from which a jury could reasonably infer that the law enforcement officials involved were motivated by a discriminatory purpose and their actions

had a discriminatory effect.

345 F.3d at 1168. The Tenth Circuit explained that, in "the absence of an overtly discriminatory policy or of direct evidence of police motivation," most § 1983 claims for racially selective law enforcement rely on "statistical comparisons between the number of black or other minority Americans stopped or arrested and their percentage in some measure of the relevant population." 345 F.3d at 1168. The Tenth Circuit noted that "[t]his requires a reliable measure of the demographics of the relevant population, a means of telling whether the data represent similarly situated individuals, and a point of comparison to the actual incidence of crime among different racial or ethnic segments of the population." 345 F.3d at 1168 (internal citations omitted)(citing United States v. Armstrong, 517 U.S. at 469-70; Chavez v. Ill. State Police, 251 F.3d 612, 640-45 (7th Cir. 2001)). "[A] police officer's pattern of traffic stops and arrests, his questions and statements to the person involved, and other relevant circumstances may support an inference of discriminatory purpose in this context." Marshall v. Columbia Lea Reg'l Hosp., 345 F.3d at 1168.

In Blackwell v. Strain, the defendant appealed from the district court's denial of summary judgment based on qualified immunity where the plaintiff alleged that "he was stopped, detained, subjected to a heightened inspection level, and issued a citation . . . because he is black," in violation of his equal-protection rights. 496 F. App'x at 837. The plaintiff, Blackwell, was driving a tractor-trailer on Interstate Highway 10 when the defendant officer, Strain, at the Point of Entry ("POE") in Lordsburg, New Mexico, asked him to pull his truck to the side, and, during an inspection, discovered alcohol in violation of New Mexico transportation regulations. See 496 F. App'x at 838. Strain ordered Blackwell to remove his tractor-trailer from service for twenty-four hours and assessed him a $250.00 penalty. See 496 F. App'x at 838. The

Honorable M. Christina Armijo, United States District Court Judge for the District of New Mexico, denied summary judgment to Strain, concluding that, based on three statistical sets that Blackwell produced, a jury could reasonably conclude that a discriminatory purpose motivated Strain. <u>See</u> 496 F. App'x at 840-41. The Tenth Circuit reversed, however, and ordered the district court to enter summary judgment in Strain's favor, concluding that the first data was irrelevant, as it did not provide sufficient statistics about Strain specifically, and the other two data sets were insufficient as a matter of law to show discriminatory purpose, as, "[e]ven assuming these statistical data sets are valid and reliable, they do not show a pattern of discrimination as stark as that in <u>Gomillion</u> or <u>Yick Wo</u>." <u>Blackwell v. Strain</u>, 496 F. App'x at 841.

In relation to the first data set, the Tenth Circuit stated that Blackwell's expert was prepared to testify about data which tended to show that law enforcement activities at the POE "produce 'race based differentials in outcomes'" and that "'30.6% of the arrests by Officer Strain at the POE are Blacks, even though Black truckers make up only 14.6% of the truckers passing through the POE.'" <u>Blackwell v. Strain</u>, 496 F. App'x at 841. The Tenth Circuit concluded that these statistics were irrelevant based on two grounds. First, because most of the data was based on law-enforcement conduct of "personnel at the POE as a whole, rather than the conduct of Officer Strain individually," the jury could not rely on it to find a discriminatory purpose as "'it would be a gross misuse of statistical data to extrapolate about [a particular officer's conduct] merely from aggregate data that covers many other individuals.'" 496 F. App'x at 841 (alterations in original)(quoting <u>United States v. Coleman</u>, 483 F. App'x 419, 421(10th Cir. 2012)(unpublished)). Second, the Tenth Circuit concluded that, "of those individuals Officer Strain stops, detains, and subjects to a heightened inspection level, a high percentage he

ultimately arrests are black, more than double the percentage of truck drivers passing through the POE who are black." 496 F. App'x at 841. The Tenth Circuit stated that the statistical evidence did not prove discriminatory purpose, "because there is no reliable measure of the demographics of the relevant population, no means of telling whether the data represent similarly situated individuals, and no point of comparison to the actual incidence of crime among different racial segments of the population." 496 F. App'x at 841.

Blackwell's second statistical data set showed that,

[a]t the POE, Officer Strain arrests Blacks at a rate that is twice their representation in the population of truckers passing through the POE, whereas the percentage of Blacks arrested by Officer Strain as the result of patrolling (where, as Dr. Williams hypothesized, it is more difficult for Officer Strain to confirm the driver's ethnicity prior to initiating law enforcement activity) closely corresponds to the percentage of Black truckers in the population of truckers passing through the POE.

496 F. App'x at 842 (original alterations omitted). The Tenth Circuit noted:

[T]he record indicates the arrest data, at least with respect to arrests made while on patrol, includes individuals who are not truck drivers. Thus, it appears we lack a reliable measure of the demographics of the relevant population, i.e., the percentage of <u>individuals</u>, as opposed to <u>truck drivers</u>, in the areas Officer Strain patrols who are black.

496 F. App'x at 843 (emphases in original). The Tenth Circuit went further, however, stating:

This comparison of the percentage of black <u>individuals</u> arrested by Officer Strain as the result of patrolling with the percentage of black <u>truckers</u> he arrested passing through the POE is inappropriate. Even assuming its validity, however, this statistical comparison does not show a stark pattern of discrimination similar to that in <u>Gomillion</u> or <u>Yick Wo</u>. That is, the statistics are not so compelling that the only explanation for the anomalies therein is intentional racial discrimination. Thus, standing alone, this statistical evidence is not evidence from which a jury could reasonably infer Officer Strain was motivated by a discriminatory purpose.

496 F. App'x at 843 (emphases in original).

The third statistical data set, which the Tenth Circuit held was insufficient as a matter of law to prove discriminatory purpose, was the seven searches that Strain performed the day of

Blackwell's search, which Blackwell asserted showed that Strain subjected black truckers to more intrusive inspections than other truckers. See 496 F. App'x at 843. The Tenth Circuit held that the sample, although relevant, was, on the one hand, unreliable, as it was based on too small of a sample, and, on the other hand, even if reliable, was not statistically significant enough to meet the Gomillion v. Lightfoot or Yick Wo v. Hopkins standard for discriminatory purpose:

> [T]he district court cited to statistical evidence regarding inspections conducted by Officer Strain at the POE:
>
>> [O]n the date that Officer Strain encountered [Blackwell], Officer Strain inspected seven trucks. Three of the seven truckers (43%), well in excess of their representation (14.6%) in the population of truckers passing through the POE were Black, and every one of the Black truckers was subjected to a Level II inspection, which includes a safe loading check. The two truckers who were White were subjected to Level III inspections. Two of the truckers were Hispanic: one was subjected to a Level III inspection and one was subjected to a Level II inspection.
>
> (citations omitted). This statistical evidence, although relevant, is based on seven inspections performed by Officer Strain on a single day and is, therefore, not reliable. See United States v. James, 257 F.3d 1173, 1180 (10th Cir. 2001) (stating that a sample size may be "too small to provide reliable statistical results"); Chavez [v. Ill. State Police], 251 F.3d at 643 (noting that a sample size must be "sufficiently large to be reliable"). Even assuming its reliability, however, it does not show a stark pattern of discrimination like that in Gomillion or Yick Wo, and, therefore, cannot by itself demonstrate discriminatory purpose.

Blackwell v. Strain, 496 F. App'x at 843 (emphases in original). The Tenth Circuit concluded that, based on the failure of these three statistical data sets to support his contention that Strain acted with a discriminatory purpose, "Blackwell failed to meet his burden." 496 F. App'x at 844.

The Court applied the Blackwell v. Strain analysis in United States v. Alabi, No. CR 11-2292 JB, 2013 WL 2284956 (D.N.M. May 15, 2013)(Browning, J.), aff'd, 597 F. App'x 991 (10th Cir. 2015), determining that the defendant's evidence purportedly showing an officer's

actions were discriminatory were not reliable, because it relied on incomplete New Mexico State

Police ("NMSP") vehicle search records:

> By compiling NMSP records and court records via IPRA requests, and any other source reflecting NMSP vehicle searches on the side of a state highway from January 1, 2011, to December 31, 2011, performed primarily in Quay County, Alabi found record of twenty-three vehicle searches. Out of the twenty-three searches, based on visual inspection of the subjects' pictures, Alabi's investigator, Elliot, concluded that, based on visual inspection of the pictures of the subjects, twenty-one of the searches' subjects were of a minority race. . . . First, this evidence is unreliable at best; Elliot admitted at the evidentiary hearing that, if an NMSP officer had conducted a consent search of a vehicle after performing a traffic stop, but did not record the search on the officer's daily activity log, Elliot would have no way of knowing about the search, and it is not included in the twenty-three subjects he identified. . . . As the Tenth Circuit recognized in Blackwell v. Strain, any statistical proof used to prove discriminatory intent via statistical inference "requires reliable comparison data." 496 F. App'x at 843 (citing Chavez v. Ill. State Police, 251 F.3d at 642-45). These searches, given that they are only representative statistics for vehicle searches if NMSP officers recorded the searches in their dailies, and if Elliot found record of the dailies in which they were recorded, are not reliable comparison data.

United States v. Alabi, No. CR 11-2292 JB, 2013 WL 2284956, at *48 (citations

omitted). The Court also determined that the evidence did not provide an appropriate

basis for comparison:

> Here, Alabi did not proffer any evidence or information about the demographics or characteristics of the larger category of people whom the NMSP subjected to traffic stops in Quay County on I-40 in the first six months of 2011. Alabi also did not have any information about the demographics or characteristics of the larger category of people who were travelling along I-40 during the first six months of 2011. Alabi, therefore, failed to give any "reliable measure of the demographics of the relevant population" and gave the Court no "means of telling whether the data represent similarly situated individuals, and [no] point of comparison to the actual incidence of crime among different racial or ethnic segments of the [relevant] population." Marshall v. Columbia Reg'l Hosp., 345 F.3d at 1168 (internal citations omitted). Thus, the twenty-three searches that Alabi presented are only relevant to his racially selective law enforcement claim if it can be presumed that NMSP in Quay and Guadalupe Counties pulled over the same number people of all races, for the same offenses. Tenth Circuit and Supreme Court precedent is clear that these presumptions are impermissible. . . . The Court does not know how many stops there were total, the demographics of the stops, even how many searches there were total, or the demographics of those

total searches.  The Court also does not know how many people refused to give
consent.  On balance, the snapshot that the Alabi's statistical evidence presents is
of little substantial value.

United States v. Alabi, No. CR 11-2292 JB, 2013 WL 2284956, at *49 (citations omitted).  The

Tenth Circuit upheld the Court's determination, concluding that the defendant's statistical

evidence was "of little use" because it provided no information on "the broader population from

which he drew the limited sample of twenty-three drivers," and "failed to demonstrate drivers of

different races speed with the same frequency."  United States v. Alabi, 597 F. App'x at 997.[12]

## LAW REGARDING OBTAINING DISCOVERY ON A SELECTIVE ENFORCEMENT AND SELECTIVE PROSECUTION CLAIM

A defendant seeking discovery related to a selective prosecution claim "need not

establish a prima facie case of selective prosecution, but they must satisfy a 'rigorous

standard' . . . . [and] produce 'some evidence' of both discriminatory effect and discriminatory

intent."  United States v. Alcaraz-Arellano, 441 F.3d 1252, 1264 (10th Cir. 2006)(quoting

Armstrong, 517 U.S. at 468).  The Supreme Court explains that ordering discovery for a

selective prosecution claim

---

[12]United States v. Alabi is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A) ("Unpublished opinions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court concludes that United States v. Alabi, Blackwell v. Strain, 496 F. App'x 836 (10th Cir. 2012); and United States v. Montes, 280 F. App'x 784 (10th Cir. 2008) have persuasive value with respect to material issues, and will assist the Court in its preparation of this Memorandum Opinion and Order.

imposes many of the costs present when the Government must respond to a prima facie case of selective prosecution. It will divert prosecutors' resources and may disclose the Government's prosecutorial strategy. The justifications for a rigorous standard for the elements of a selective-prosecution claim thus require a correspondingly rigorous standard for discovery in aid of such a claim.

Armstrong, 517 U.S. at 468.

The Tenth Circuit applies the same standard for requesting discovery for selective enforcement claims as it does for selective prosecution claims. See United States v. Alcaraz-Arellano, 441 F.3d at 1264 (stating that the "elements [for a selective prosecution claim] are essentially the same for a *selective enforcement* claim," and noting that the Tenth Circuit previously applied the same standard to a selective enforcement claim in United States v. James, 257 F.2d at 1178-81 (emphasis in original)); United States v. James, 257 F.2d at 1179 (applying the selective prosecution standard to the "investigative phase of the prosecution").

In considering whether the defendant has presented statistics showing "some evidence" of discriminatory effect, courts consider the data's credibility in showing that law enforcement or prosecutors treated other similarly-situated individuals differently. United States v. Armstrong, 517 U.S. at 470–71 (finding a study inadequate where it "failed to identify individuals who were not black and could have been prosecuted for the offenses for which respondents were charged, but were not so prosecuted," and concluding that a newspaper article about the discriminatory effect of drug sentencing laws and anecdotal accounts in affidavits were not sufficient).

"Discriminatory intent can be shown by either direct or circumstantial evidence." United States v. Alcaraz-Arellano, 441 F.3d at 1264 (citing United States v. Deberry, 430 F.3d 1294, 1299 (10th Cir.2005)). When it comes to a selective enforcement claim, the Tenth Circuit has indicated that, where the evidence shows that the law enforcement officer did not have discriminatory intent regarding the defendant in particular, the defendant cannot satisfy the

discriminatory intent requirement for obtaining discovery. See United States v. Alcaraz-Arellano, 441 F.3d at 1265. In United States v. Alcaraz-Arellano, the Tenth Circuit concluded that, because the deputy "made the decision to stop [the defendant] before knowing his ethnicity," the defendant "cannot satisfy the discriminatory-intent prong of the Armstrong standard for obtaining discovery or dismissal on the basis of selective enforcement." United States v. Alcaraz-Arellano, 441 F.3d at 1265. The Tenth Circuit reached that conclusion even in light of "disturbing" vehicle stop statistics indicating racial bias. 441 F.3d at 1266 n.1 ("[T]he stop statistics that Mr. Alcaraz–Arellano has presented are disturbing. We assume that in future investigations federal prosecutors will take the utmost care to assure themselves that racial profiling is not lurking behind such statistics.").

## ANALYSIS

The Court will deny the Motion. The Court determines that Laneham's statistical and anecdotal evidence fails to establish sufficient evidence that the ATF caused a discriminatory effect by treating similarly situated individuals differently than it treated African-Americans, or that the ATF agents or their confidential informants acted with discriminatory intent against African-Americans. Consequently, the Court denies the Motion.

**I.      THE COURT WILL DENY THE DEFENDANT'S MOTION, BECAUSE LANEHAM HAS NOT PROVIDED "SOME EVIDENCE" OF DISCRIMINATORY EFFECT AND DISCRIMINATORY INTENT.**

A defendant seeking discovery for a selective enforcement claim must meet a "'rigorous standard'" by providing "'some evidence'" of (i) discriminatory effect, and (ii) discriminatory intent. United States v. Alcaraz-Arellano, 441 F.3d at 1264 (quoting Armstrong, 517 U.S. at 468).

**A.     LANEHAM HAS NOT PROVIDED "SOME EVIDENCE" OF DISCRIMINATORY EFFECT, BECAUSE HE HAS NOT MADE A CREDIBLE SHOWING THAT THE ATF TREATED SIMILARLY SITUATED INDIVIDUALS DIFFERENTLY.**

Laneham has not provided "some evidence" of discriminatory effect because neither his statistical evidence nor the ATF's failure to arrest an unidentified white male establishes that the ATF treated similarly situated groups differently.   When seeking discovery for a selective enforcement or selective prosecution claim, a defendant must demonstrate a discriminatory effect by showing that law enforcement or prosecutors treated similarly situated individuals differently. See Armstrong, 517 U.S. at 465 ("To establish a discriminatory effect in a race case, the claimant must show that similarly situated individuals of a different race were not prosecuted."); United States v. James, 257 F.3d at 1179 ("If such a claim is based on the investigative phase of the prosecution, . . . the defendant must . . . make a credible showing that a similarly-situated individual of another race could have been, but was not, arrested or referred for federal prosecution for the offense for which the defendant was arrested and referred."); United States v. Alcaraz-Arellano, 441 F.3d at 1264 ("To satisfy the discriminatory-effect element, one who claims selective enforcement 'must . . . make a credible showing that a similarly-situated individual of another race could have been, but was not, [stopped or] arrested . . . for the offense for which the defendant was [stopped or] arrested. . . .'" (quoting United States v. James, 257 F.3d at 1179)(alterations in original)); United States v. Montes, 280 F. App'x 784, 788 (10th Cir. 2008)("To establish discriminatory effect, a defendant . . . must 'make a credible showing that a similarly-situated individual of another race could have been, but was not, stopped or arrested for the offense for which the defendant was stopped or arrested.'" (quoting   United States v. Alcaraz-Arellano, 441 F.3d at 1264)).   The defendant must make a "credible showing" of a discriminatory effect either "by identifying a similarly-situated individual [who was treated

differently] or through the use of statistical evidence." United States v. James, 257 F.3d at 1179 (citing Chavez v. Ill. State Police, 251 F.3d at 636).

       1.       **Laneham's Statistical Evidence Does not Credibly Establish that the ATF Treated Similarly Situated Individuals Differently.**

Here, Laneham provides evidence that the percentage of the ATF's Surge Defendants who are African-American -- twenty-seven percent -- is disproportionate to the percentage of African-Americans in Bernalillo County -- about three percent -- and the percentage of African-Americans who faced drug trafficking or weapons-related charges in the District of New Mexico between 2006 and 2015 -- about five percent. This comparison is unpersuasive.

For starters, the Bernalillo County numbers are irrelevant. Arguing that the ATF's Surge Defendants should proportionally reflect Bernalillo County's demographics is unavailing as a matter of fact and law. The Supreme Court, in Armstrong, held that courts should not presume that people of all races and ethnicities commit all crimes with the same frequency. See Armstrong, 517 U.S. at 469-70. As for the District of New Mexico demographic data for drug trafficking and firearms-related offenses, those numbers get closer to the mark, but they fall short of a "credible showing" under United States v. James, 257 F.3d at 1179. Laneham has not convinced the Court that the apparent disparity that Laneham identifies is statistically significant, or that the disparity demonstrates that the ATF treated similarly situated individuals differently. When it comes to determining whether statistical evidence establishes discriminatory effect, courts apply a high standard, inquiring into whether the data is comprehensive, reliable, and relevant, and whether the results are statistically significant. In United States v. James, for instance, the Tenth Circuit determined that the defendant's data was insufficient to provide "some evidence" of discriminatory effect when the data showed a considerable disparity between a very high arrest rate of African-Americans for dealing crack and a far lower percentage of

African-Americans among the 114 people participating in a local cocaine and crack treatment group. See United States v. James, 257 F.3d at 1179-80. While United States v. James demonstrates that, at the very least, not just any offering of somewhat logically connected statistical evidence will do, other courts have rejected far more developed statistical studies. The United States District Court for the District of Kansas, for instance, found a four-month study that recorded the race of cars' drivers that law enforcement stopped on a Kansas highway to be "irrelevant and unreliable," because it was methodologically flawed, and because the data did not relate to the particular law enforcement agency or Deputy whose conduct was in question. United States v. Alcaraz-Arellano, 302 F. Supp. 2d 1217, 1228 (D. Kan. 2004)(Crow, J.), aff'd, 441 F.3d 1252 (10th Cir. 2006).[13] The Seventh Circuit, in Chavez v. Illinois State Police, 251 F.3d 612, 643 (7th Cir. 2001), determined that a similar study was inadequate. See 251 F.3d at 643 (rejecting a study suggesting that Hispanic and African-American drivers were stopped "more than two standard deviations over the expected norm, based upon the representation of each of these groups in the population" because, among other things, a citation database did not make a record of every stop).

The Court concludes that there are several reasons why Laneham does not make a credible showing that his statistical evidence establishes discriminatory effect. For one, the District of New Mexico statistics do not relate to individuals similarly situated to Laneham. The ATF's Surge operation focused on one Albuquerque region, and its stated goal was to target the "worst of the worst": people with a history of violent crime. See Casanova Tr. at 80:25

---

[13]Although the Tenth Circuit affirmed the District Court's decision, it did not review the district court's discriminatory effect analysis. See United States v. Alcaraz-Arellano, 441 F.3d 1252, 1266 (10th Cir. 2006)("Having held that Mr. Alcaraz-Arellano failed to present evidence satisfying *Armstrong's* discriminatory-intent prong, we need not address whether the evidence he presented satisfied the discriminatory-effect prong.").

(Johnson)(stating that the ATF focused on the "worst of the worst"); id. at 81:12-23 (Johnson)

("We're not going to make an impact in a city by arresting some 18-year-old kid for half ounce

of meth. . . . It doesn't change the neighborhood. We want the guy that's going to make people

safer if that guy is gone."); id. at 7:18-25 (Johnson)(stating that, in deciding whether to pursue

someone, the ATF agents considered the person's "known criminal history [and] criminal

reputation"). For statistical evidence to have any hope for making a credible case for the ATF

treating similarly situated individuals differently, it must, at the very least, say something about

enforcement trends vis-à-vis individuals who (i) commit drug trafficking or firearm related

offenses, (ii) live in a city; and (iii) have a history of violent crime. Laneham's District of New

Mexico statistics, by contrast, reflect the demographic trends of offenders throughout New

Mexico and include offenders without histories of violent crime. See DNM statistics. Even that

kind of evidence may not be enough, however, as it would not say anything about the ATF's

actions in particular -- i.e., it may not rule out other explanations for the Surge's high percentage

of African-American Defendants. Laneham provides no argument or authority why the Court

should consider that the twenty-eight African-Americans among the 103 Surge-related

Defendants arrested over four months in 2016 as a statistically significant result. The Court

cannot soundly ignore the possibility that the results are statistical noise from an inadequate

sample size or that confounding factors produced the results. Laneham has not ruled out those

possibilities.[14]

_____

[14]The Court acknowledges that this standard risks creating a Catch 22 for defendants like
Laneham, for whom the evidence necessary to meet the Armstrong standard is the precise
evidence that the defendant seeks in discovery -- e.g., information about people against whom
the ATF did and did not enforce the law. There is no question that, in the Tenth Circuit, the
standard for showing selective enforcement is the same as for showing selective prosecution.
See United States v. Alcaraz-Arellano, 441 F.3d at 1264 (stating that the "elements [for a
selective prosecution claim] are essentially the same for a selective enforcement claim," and

noting that the Tenth Circuit previously applied the same standard to a selective enforcement claim in United States v. James, 257 F.2d at 1178-81 (emphasis in original)); United States v. James, 257 F.2d at 1179 (applying the selective prosecution standard to the "investigative phase of the prosecution"). The Tenth Circuit also applies the same standard to selective enforcement discovery requests as it does to selective prosecution claims. In United States v. Alcaraz-Arellano, for instance, the Tenth Circuit asserted that the reasons for setting a "'demanding'" standard of proof for selective prosecution claims -- that judicial oversight risks excessive with the executive branch's administering of justice -- applies to selective enforcement claims, and concludes that, "[f]or similar reasons[,] discovery [for both types of claims] is limited." 441 F.3d at 1264 (quoting Armstrong, 517 U.S. at 463). Consequently, the Tenth Circuit took Armstrong's requirement that a selective prosecution claimant show "some evidence" of discriminatory intent and effect to get discovery, and applied it to a selective enforcement claimant seeking discovery. United States v. Alcaraz-Arellano, 441 F.3d at 1264. See United States v. Dixon, 486 F. Supp. 2d 40, 44–45 (D.D.C. 2007)(Walton, J.)(noting that the Tenth Circuit has "sensibly applied" Armstrong's standards for obtaining selective prosecution discovery to selective enforcement discovery requests (citing United States v. Alcaraz-Arellano, 441 F.3d at 1264-65)).

In practice, however, Armstrong's discovery standard may be most appropriate for selective prosecution cases than for selective enforcement cases, given that defendants asserting selective prosecution will have an easier time identifying similarly situated individuals if they need only to parse public records and police reports for the necessary comparative facts, as Armstrong suggests. See Armstrong, 517 U.S. at 470 ("[R]espondents could have investigated whether similarly situated persons of other races were prosecuted by the State of California and were known to federal law enforcement officers, but were not prosecuted in federal court."). Selective enforcement defendants, meanwhile, need specific information about individuals never caught in the first place, or insights into law enforcement officers' hearts and minds -- information that is either in the law enforcement agency's exclusive possession or does not exist at all. See Richard H. McAdams, Race and Selective Prosecution: Discovering the Pitfalls of Armstrong, 73 Chi.-Kent L. Rev. 605 (1998)(arguing that, "[f]or certain offenses, even when prosecutors select defendants on the basis of race, the similarly situated requirement will be effectively impossible to meet"). The standard is not impossible -- in the Northern District of California, for instance, a court found ample evidence of selective enforcement when the record showed that, among other things, a CI specifically bypassed a drug dealer who was not African-American, and law enforcement officers were heard using racial epithets. See United States v. Mumphrey, 193 F. Supp. 3d 1040, 1063-64 (N.D. Cal. 2016)(Chen, J.). Although not impossible, it is undoubtedly more difficult to show some evidence of selective enforcement than it is to show selective prosecution, and the Tenth Circuit has not, as far as the Court can discern, justified this imbalance by some deliberate policy consideration.

In recent years, courts in other Circuits have started to recognize that applying Armstrong's selective prosecution standards may not be appropriate for selective enforcement claims. The Seventh Circuit got the ball rolling in 2015, highlighting the key differences between prosecutors and law enforcement:

> Agents of the ATF and FBI are not protected by a powerful privilege or covered by a presumption of constitutional behavior. Unlike prosecutors, agents regularly

testify in criminal cases, and their credibility may be relentlessly attacked by defense counsel.  They also may have to testify in pretrial proceedings, such as hearings on motions to suppress evidence, and again their honesty is open to challenge.  Statements that agents make in affidavits for search or arrest warrants may be contested, and the court may need their testimony to decide whether if shorn of untruthful statements the affidavits would have established probable cause.  See *Franks v. Delaware*, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978).  Agents may be personally liable for withholding evidence from prosecutors and thus causing violations of the constitutional requirement that defendants have access to material, exculpatory evidence. See, e.g., *Armstrong v. Daily*, 786 F.3d 529 (7th Cir. 2015); *Newsome v. McCabe*, 256 F.3d 747, 752 (7th Cir. 2001). Before holding  hearings (or civil trials) district judges regularly, and properly, allow discovery into nonprivileged aspects of what agents have said or done. <u>In sum, the sort of considerations that led to the outcome in *Armstrong* do not apply to a contention that agents of the FBI or ATF engaged in racial discrimination when selecting targets for sting operations, or when deciding which suspects to refer for prosecution.</u>

<u>United States v. Davis</u>, 793 F.3d 712, 720-721 (7th Cir. 2015)(Rovner, J.)(emphasis added).  The Seventh Circuit, in <u>United States v. Davis</u>, did not expressly overrule its previous holding that the <u>Armstrong</u> standards apply to both selective prosecution and selective enforcement claims, so it remains an open question whether the Seventh Circuit has officially switched its <u>Armstrong</u> policy.  <u>See United States v. Lamar</u>, No. CR 14-726, 2015 WL 4720282, at *5 (S.D.N.Y. Aug. 7, 2015)(Gardephe, J.)(noting that, in <u>United States v. Davis</u>, the "Seventh Circuit did not set forth a separate standard for obtaining discovery concerning a selective enforcement claim, however, nor did it address -- much less explicitly overrule -- its holding" in <u>United States v. Barlow</u>).  In any event, <u>United States v. Davis</u> has resonated in other courts.  Just a few months ago, the United States Court of Appeals for the Third Circuit announced that it agreed with <u>United States v. Davis</u>, concluding that "the enforcement/prosecution distinction is a legitimate one," and defining new standards for district courts facing discovery requests for selective enforcement claims:

> [A] district court retains the discretion to conduct a limited pretrial inquiry into the challenged law enforcement practice on a proffer that shows "some evidence" of discriminatory effect. The proffer must contain reliable statistical evidence, or its equivalent, and may be based in part on patterns of prosecutorial decisions (as was the case in *Davis*) *even if* the underlying challenge is to law enforcement decisions. Distinct from what is required under *Armstrong/Bass*, a defendant need not, at the initial stage, provide "some evidence" of discriminatory intent, or show that (on the effect prong) similarly situated persons of a different race or equal protection classification were not arrested or investigated by law enforcement. However, the proffer must be strong enough to support a reasonable inference of discriminatory intent and non-enforcement.

<u>United States v. Washington</u>, 869 F.3d 193, 219-21 (3d Cir. 2017)(McKee, J.).  <u>See United</u>

**2.** The Unidentified White Male Who Was **Not** Arrested Does Not Establish Discriminatory Effect**,** Because the White Male **is** Not Similarly Situated to Laneham**.**

Laneham argues that the ATF's decision to not arrest an unidentified white male involved in a drug transaction establishes discriminatory effect, because Laneham and the white male are similarly situated. See Reply at 10. Specifically, Laneham argues that both "allegedly committed roughly the same crime under roughly the same circumstances," i.e., "they each allegedly delivered the methamphetamine for a purchase of methamphetamine." Tr. at 87:14-22 (Hotchkiss). Laneham asserts that, to be similarly situated, they "don't have be wearing the same color shirt, they don't have to have the same criminal history," because, in Laneham's view, the key question is: "Did they commit . . . roughly the same crime under roughly the same circumstances?" Tr. at 87:16-19 (Hotchkiss).

In the Tenth Circuit, a "similarly situated" individual is someone who could have been, but was not, arrested for the same offense for which the defendant was arrested. See United States v. Montes, 280 F. App'x at 788 (stating that "a defendant claiming race-based selective enforcement in a traffic stop or arrest must 'make a credible showing that a similarly-situated individual of another race could have been, but was not, stopped or arrested for the offense for

---

States v. Hare, 820 F.3d 93, 101 (4th Cir. 2016)(finding that a party's arguments urging it to adopt the United States v. Davis approach to selective enforcement were "well taken" but concluding that it need not make the determination), cert. denied, 137 S. Ct. 224 (2016), reh'g denied, 137 S. Ct. 460 (2016); United States v. Mumphrey, 193 F. Supp. 3d at 1048 ("Although the Court agrees with the reasoning in *Davis*, it need not resolve [in this case] this issue whether *Armstrong* applies with full force to claims of selective enforcement.").

In any event, Tenth Circuit precedent binds the Court, and in the Tenth Circuit, the standard for requesting selective enforcement discovery is the same as for requesting selective prosecution discovery. See United States v. Alcaraz-Arellano, 441 F.3d at 1264 (noting that the elements needed to prove a selective enforcement claim and selective prosecution claim are "essentially the same"; discovery for both types of claims "is limited"; and applying Armstrong's discovery standard to a selective enforcement claim).

which the defendant was stopped or arrested.'" (quoting <u>United States v. Alcaraz-Arellano</u>, 441

F.3d at 1264)).

> If such a claim is based on the investigative phase of the prosecution . . . the defendant must instead make a credible showing that a similarly-situated individual of another race could have been, but was not, arrested or referred for federal prosecution for the offense for which the defendant was arrested and referred.

<u>United States v. James</u>, 257 F.3d at 1179 (citing <u>United States v. Jones</u>, 159 F.3d 969, 977 (6th

Cir. 1998))).

When it comes to selective enforcement claims in specific operations limited in time and

scope -- <u>e.g.</u>, a sting operation -- other Courts of Appeals define a "similarly situated" person as

someone whom the specific operation might have targeted under the operation's particular

process and goals. <u>See</u> <u>United States v. Hare</u>, 820 F.3d 93, 99 (4th Cir. 2016)(holding that

"[a]ppelants' statistical evidence . . . provides no appropriate basis for comparison, as it contains

no data on similarly situated white individuals who could have been targeted for stash house

sting investigations but were not"); <u>United States v. Alexander</u>, No. CR 11-148-1, 2013 WL

6491476, at *5 (N.D. Ill. Dec. 10, 2013)(St. Eve, J.)(allowing "limited discovery of the ATF's

policies and procedures regarding the selection criteria for targets of phony stash-house robbery

cases in place at the time of Alexander's arrest" in light of the difficulty of identifying a

"similarly situated" group without that information); <u>United States v. Lamar</u>, CR No. 14-726,

2015 WL 4720282, at *15 (S.D.N.Y. Aug. 7, 2015)(Gardephe, J.)(noting that the Drug

Enforcement Agency chose its sting operation targets by asking informants for names of people

with a history of robbery and/or violent crime, and defining "similarly situated" people as those

specific individuals whom the informants identified). <u>Cf.</u> <u>United States v. Olvis</u>, 97 F.3d 739,

744 (4th Cir. 1996)("[D]efendants are similarly situated when their circumstances present no

distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them.").

Tenth Circuit precedent does not bar this definition.  The two most recent Tenth Circuit selective enforcement cases -- United States v. Alcaraz–Arellano and United States v. Montes -- deal with traffic stops, and, in United States v. Montes, then-Judge Gorsuch limited its "similarly situated" definition -- i.e., someone who could have been, but was not, stopped or arrested for the same offense -- to traffic stop situations.  See United States v. Montes, 280 F. App'x at 788 (stating that "a defendant claiming race-based selective enforcement in a traffic stop or arrest must make a credible showing that a similarly situated individual of another race could have been, but was not, stopped or arrested for the offense for which the defendant was stopped or arrested." (emphasis added)).  The first Tenth Circuit case to consider a selective enforcement claim, United States v. James, deals with arrests and prosecutions relating to a "joint drug investigation" targeting drug dealers in public housing, 257 F.3d at 1176, and appears to apply the same straightforward definition for a similarly-situated individual, see 257 F.3d at 1179 (requiring that, for claims "based on the investigative phase," a defendant must "make a credible showing that a similarly-situated individual of another race could have been, but was not, arrested . . . for the offense for which the defendant was arrested . . . .").  United States v. James' law enforcement operation was, however, straightforward as well: the Kansas Police Department was after drug dealers.  See 257 F.3d at 1176.  By contrast, the cases from other United States Courts of Appeals cited above deal with specific law enforcement operations with narrow scopes, such as "stash house sting" operations where law enforcement recruited individuals with particular criminal backgrounds.  See United States v. Hare, 820 F.3d at 99; United States v. Alexander, CR No. 11-148-1, 2013 WL 6491476, at *5; United States v. Lamar,

CR No. 14-726 PGG, 2015 WL 4720282, at *15. The ATF's Surge operation here in Albuquerque is more like the stash house sting operations in that the ATF targeted certain criminals committing specific crimes -- drug and weapons dealers with criminal backgrounds -- whereas the operation in United States v. James targeted all violators of certain crimes, regardless of their criminal histories. Consequently, the Tenth Circuit in United States v. James did not need to provide a more specific definition for a "similarly situated" individual.

To be clear, the Court does not depart from the Tenth Circuit's rule, expressed in United States v. Alcaraz-Arellano and United States v. Montes that a similarly situated person is one who could have been, but was not, arrested or stopped for the same crime. Rather, this case presents a new factual situation requiring a more precision definition, one that considers the law enforcement operation's goals and scope. Simply asking whether someone could have been arrested but was not provides no insight whether the ATF discriminated against Laneham; by that definition, the unidentified white male would be similarly situated to Laneham, because the ATF could have, but did not, arrest him immediately after witnessing him commit the crime. Of course, the ATF also did not arrest Laneham immediately. The ATF explained, persuasively, that it will not typically arrest people immediately after a deal with an undercover officer, because doing so would signal that the undercover agent is actually a law enforcement officer. See Tr. at 53:18-25 (Johnson). When a law enforcement operation has specific goals, a narrow scope, and a particular process, the Court must consider those factors when determining whether the law enforcement agency discriminated against a defendant. Furthermore, defining a "similarly situated" individual in terms of a particular law enforcement operation's goal and scope makes sense in light of the selective enforcement claim's purpose. A law enforcement officer violates the Constitution when he or she enforces the law against people of one race but

not another on the basis of their race; if the law enforcement officer is conducting an operation which targets only a particular category of person -- e.g., someone with a particular criminal history -- then the officer is limited in his or her discretion -- and thus in his or her opportunities for discriminatory enforcement -- to those people within that narrow group. Applying the Tenth Circuit's "similarly situated" definition -- someone who "could have been, but was not, stopped or arrested for the offense for which the defendant was stopped or arrested," United States v. Montes, 280 F. App'x at 788 -- would fail, in this situation, to capture discriminatory decisions, because, in this case, the ATF was not looking for people who could be arrested for a particular crime; they were looking for people with certain criminal backgrounds who committed a particular crime.

Thus, when it comes to asserting a selective enforcement argument against law enforcement engaged in a particular operation, the key question is not whether they committed roughly the same crime under roughly the same circumstances, but also whether they both fell within the operation's target criteria. Moreover, the analysis should consider the law enforcement agency's capacity to identify and arrest the individuals, just as courts consider, in selective prosecution cases, the relative strength of the prosecutor's evidence against defendants accused of comparable crimes. See United States v. Smith, 231 F.3d at 810-11 (defining a "similarly situated" person as one who committed "the same basic crime in substantially the same manner . . . and against whom the evidence was as strong or stronger than that against the defendant" (emphasis added)). In other words, if the law enforcement agency takes comparable steps to identify two suspects, and turns up enough information to identify and locate one but not the other, then the agency's failure to arrest the other person does not, on its own, indicate that they have selectively enforced the law.

Laneham and the unidentified white male are not "similarly situated" under these standards, because Laneham has not shown that the white male fell within the ATF's Surge operation's target criteria. As noted above, the goal of the ATF's Surge operation was to target people dealing drugs or weapons who had a history of violent crime. See Casanova Tr. at 81:12-23 (Johnson)("We're not going to make an impact in a city by arresting some 18-year-old kid for half ounce of meth. . . . It doesn't change the neighborhood. We want the guy that's going to make people safer if that guy is gone."); Tr. at 7:18-25 (Johnson)(stating that, in deciding whether to pursue someone, the ATF agents considered the person's "known criminal history [and] criminal reputation"). Once the ATF identified Laneham, they reviewed his criminal history "and learned that he had six felony convictions, at least three aggravated assault arrests, [and] numerous drug traffic arrests." Tr. at 21:7-11 (Johnson). The ATF never learned the unidentified white male's identity, and, therefore, never knew whether he had a criminal history -- i.e., they could not determine whether he met the Surge's target criteria. It is true that the ATF did not arrest the unidentified white male immediately after witnessing him commit a crime, but the ATF did not arrest Laneham after allegedly witnessing him commit a similar crime. See Tr. at 53:16:25 ("We don't arrest people every time we do a deal. . . . If we go out and arrest everybody after each deal, word is going to get out [that the undercover agent is a law enforcement officer.]"). It is probably not a good idea to create rules that incentivize police to arrest someone every time they see a crime, regardless of what else may be happening, such as an ongoing investigation. Also, the ATF had little to go on when trying to identify the white male -- they knew that he was a passenger in a particular car, but the names and photographs associated with that car did not lead the ATF to identify the white male. See Tr. at 57:1-58:23 (Hotchkiss, Johnson). The ATF also looked into people associated with Casanova -- the white

male's apparent associate.  See Tr. at 57:1-58:23 (Hotchkiss, Johnson).  The ATF was unable to

identify the white male.  See Tr. at 54:8-11 (Johnson).  The ATF admitted that it did not conduct

in person interviews with the people associated with the car, but explained that doing so would

have risked alerting people to the ATF's ongoing operation, which would have put undercover

agents and CIs in danger.  See Tr. at 62:4-18 (Johnson).  The Court concludes that Laneham has

therefore not established that the unidentified white male is similarly situated.

### 3.   Laneham has not Established that the ATF Treated Similarly Situated People in other Albuquerque Regions Differently by Focusing only on Southeast Albuquerque.

Laneham also suggests that the ATF's decision to focus on southeast Albuquerque

demonstrates discriminatory effect, because the ATF treated similarly situated people differently

by overlooking other neighborhoods.  See Reply at 6.  Laneham writes:

> On the point of the targeted area, the defense asserts that the ATF had no legitimate, discernable criteria for selecting the particular area of Bernalillo County.  It is equally unclear what criteria the ATF relied upon when selecting individuals within the selected target area to target.  Understanding of the ATF's targeting criteria will enable a defense expert to construct a precise similarly situated comparison group and run statistical analyses of the defendant class against this group.  At the moment, the ATF's targeting criteria is entirely indiscernible.  Discovery is needed.

Reply at 6.  Laneham also argues that "[t]he ATF investigation in this case, to the best of

defendants' knowledge, focused on several areas in Bernalillo County that are comprised

predominantly of minority and African-American populations."  Motion at 9.

This argument is unconvincing.  For one, the ATF, in the hearing, explained its

reasoning: they chose to focus on southeast Albuquerque at the recommendation of local law

enforcement officers and the district attorney's office.  See Tr. at 5:4-11 (Johnson).  For another,

Laneham has provided no evidence suggesting that other Albuquerque regions are as worthy of

the ATF's attention as southeast Albuquerque or that southeast Albuquerque has a higher

African-American population than other regions.  Although Laneham asserts that "[d]iscovery is needed" to answer these questions, the Court concludes that some relevant information is already publically available, such as in crime maps and census tract data.[15]

**B.    LANEHAM HAS NOT PROVIDED "SOME EVIDENCE" OF DISCRIMINATORY INTENT.**

Laneham argues that he has established some evidence of discriminatory intent, because (i) three out of the ATF's five CIs are African-Americans, (ii) the ATF did not arrest an unidentified white male involved in a drug deal; (iii) the ATF focused on southeast Albuquerque; (iv) the Surge Defendants are disproportionately African-American; (v) and the ATF has a history of discrimination.  The Court is unconvinced.  "Discriminatory intent can be shown by either direct or circumstantial evidence."  United States v. Alcaraz-Arellano, 441 F.3d at 1264 (citing United States v. Deberry, 430 F.3d at 1299).  Neither the direct or circumstantial evidence provides "some evidence" of discriminatory intent.

**1.    Neither the ATF's use of Three African-American CIs nor its Failure to Arrest the Unidentified White Male Establish Discriminatory Intent.**

Laneham argues that the ATF's failure to arrest an unidentified white male involved in a similar methamphetamine transaction shows the ATF's discriminatory intent, because no basis

---

[15]As it stands, what easily accessible records that the Court was able, on its own, to find, backs up the ATF's assertion that southeast Albuquerque was worth targeting.  See Albuquerque i-team's Crime Concentration in ABQ Summary, https://docs.wixstatic.com/ugd/68fb1b_2ed8ab1f8bbe46bf907c545262aecc26.pdf (identifying southeast Albuquerque as one of the city's five major crime areas, and where over twenty percent of the city's aggravated assaults occur despite being home to only seven percent of its total population).  The Court also tried to get a sense of southeast Albuquerque's demographics, and found, based on Census tract data, that the African-American population in neighborhoods around Central Avenue between Carlisle Boulevard and Wyoming Boulevard is not much higher, if at all, than in Bernalillo County at large.  See Albuquerque Journal Census Map, https://www.abqjournal.com/maps/census.html (indicating that only about 3.7 percent of the population in tracts 5.01, 5.02, 6.03, 6.04, 9.01, 9.03, 9.04, and 11.01 are African-American); US Census QuickFacts: Bernalillo County, https://www.census.gov/quickfacts/fact/table/bernalillocountynewmexico/PST045216, viewed October 9, 2017 (stating that African-Americans comprise 3.4 percent of Bernalillo County residents).

other than race could explain the ATF's decision to arrest Laneham and not the white male.  See Reply at 10 ("[I]n the Casanova case, the ATF declined to pursue a non-Black offender who allegedly was on the same supplier-of-2-ounces-of-methamphetamine wrung as allegedly Mr. Laneham. . . . Mr. Laneham specifically and comparatively was in an allegedly very similar role in the present case."); Motion at 10 ("This image, the shackled black man and the allegedly equally culpable yet still free white man perfectly illustrates the racially discriminatory motives the ATF employed in selecting the targets of the sting.").

There is nothing in the record, however, that suggests that the ATF decided to arrest Laneham but not the white male based on their race.  Nor is there anything in the record suggesting that the ATF pursued the unidentified white male in a meaningfully different way than it pursued Laneham.  The ATF agents did not arrest the white male after witnessing him delivering methamphetamine to the undercover agent, but the ATF did not arrest Laneham immediately after allegedly witnessing him do roughly the same thing.  See Tr. at 53:16:25 ("We don't arrest people every time we do a deal. . . . If we go out and arrest everybody after each deal, word is going to get out [that the undercover agent is a law enforcement officer.]").

Moreover, the ATF identified Laneham as the man driving the white Gallant by running the car's license plate, which led them to a residential address: Laneham was "one of the individuals tied to that residence," Tr. at 25:14-20 (Johnson), and the ATF recognized his name, because they already knew of Laneham as a high-ranking leader of the Memphis Mob operating in Albuquerque.  See Tr. at 17:15-18:12 (Johnson).  The ATF showed the undercover officer Laneham's driver's license photograph, and the undercover officer confirmed that Laneham was the man in the white Gallant.  See Tr. at 25:20-24 (Johnson).  When it came to trying to identify the white male, the ATF undertook basically the same process, searching names associated with

the car in which the white male was a passenger and examining their driver's license photographs.  See Tr. at 57:1-58:23 (Hotchkiss, Johnson).  The ATF also looked into people associated with Casanova -- the white male's apparent associate.  See Tr. at 57:1-58:23 (Hotchkiss, Johnson).  The ATF came up empty handed.  See Tr. at 54:8-11 (Johnson).  The ATF did not interview people associated with the car, but the ATF explained that doing so would have put its undercover agents and CIs in danger because the operation was still ongoing.  See Tr. at 62:4-18 (Johnson).  In any case, the ATF need not undertake every conceivable investigative step to disprove discriminatory intent; the question here is whether the ATF's actions indicate discriminatory intent, and the record shows that the ATF took roughly the same steps to try to identify the white male as it did when identifying Laneham.

Laneham also argues that the ATF's use of three African-American CIs among its five total CIs "virtually guaranteed" that the "investigation and prosecution of individuals of the same racial and cultural background."  Motion at 10.  This argument fails for several reasons.  For starters, the argument presumes that CIs will be more likely to make connections with people of the same race than with people of other races; that is a plausible premise, but it is one for which Laneham provides no authority.  The Court cannot infer discriminatory intent from such circumstantial evidence without a better idea of how severely -- if at all -- the use of three African-Americans out of five CIs would affect the racial makeup of the people with whom the CIs make connections.  Second, even if the Court accepts that the ATF dispatched so many African-American CIs to catch more African-Americans criminals, Laneham has not shown that the ATF's decision discriminated against Laneham in particular.  The Tenth Circuit concluded, in United States v. Alcaraz-Arellano, that the Hispanic defendant could not establish some evidence of discriminatory intent even in light of "disturbing" statistics suggesting that a law

enforcement agency targeted Hispanics, given that the deputy "made the decision to stop [the defendant] before knowing his ethnicity." 441 F.3d at 1265. Here, the ATF's African-American CI did not initiate contact with Laneham; the CI made contact with Devoual, who then, on his own, allegedly conspired with Laneham to sell an ATF undercover agent methamphetamine. See Tr. at 19:3-25:2 (Johnson). The Court is not eager to infer racial bias based on whom a targeted individual chooses to recruit. See United States v. Colon, 71 F. Supp. 3d 269, 283 (D. Conn. 2014)(Meyer, J.)("[T]here is no evidence that the government did anything to select any of the seven defendants except for the two Colon brothers, who themselves chose their own co-conspirators."). Finally, if Laneham's theory were sound, there would be closer to sixty African-Americans among the Surge Defendants, rather than twenty-eight. It is clear that the CIs' contacts led to many non-African-American targets, given that sixty percent of the Surge Defendants are Hispanic, and eleven percent are white.

### 2. The ATF's Past Actions in Other Cities, the ATF's Focus on Southeast Albuquerque, and the Surge's Racially Disproportionate Defendant List Do Not Establish Discriminatory Intent in this Case.

Laneham asserts that the Court may infer discriminatory intent from circumstantial evidence such as the ATF's "past behavior" on similar operations in different cities, the ATF's focus on southeast Albuquerque, and the disproportionate number of African-Americans among the Surge Defendants. These assertions are unconvincing. First, Laneham contends that "[e]vidence of ATF's past behavior is highly relevant circumstantial evidence that may be used to infer intent," Reply at 5, and that the "ATF agents are aware that their practices have led to an inordinate number of minorities being arrested and that this has had 'no effect'" on how they conducted the Albuquerque Surge operation, Reply at 5 (quoting Casanova Tr. at 96:25-97:14). Laneham does not, however, provide the Court with any information about those "past behaviors," nor any authority why the Court should consider the ATF's past acts in different

cities when determining the ATF's intent in Albuquerque.  The Court is not inclined to use

charges of discrimination and other actions elsewhere as evidence of what occurred here without

Laneham digging into the details in those other cities and showing that there is a pattern of

discriminatory intent that has spread to Albuquerque.  He apparently wants the Court to do the

heavy lifting on his behalf.  Laneham has the burden to show "some evidence" of discriminatory

intent and effect.   Given this burden, mere assertions that other people have made such

allegations will not meet that standard.  Second, as discussed above, Laneham does not provide

any evidence for his assertion that Albuquerque's southeast region is "comprised predominantly

of minority[16] and African-American populations," Motion at 9, nor does Laneham offer any

compelling arguments why the Court should question the ATF's assertion that it focused on

southeast Albuquerque because of the area's high violent crime rate.  Finally, the Court will not

infer discriminatory intent based on the high number of African-Americans among the Surge's

Defendants, as Laneham has not provided persuasive arguments why those numbers are

statistically significant.

    **IT IS ORDERED** that Defendant Cedric Laneham's Motion for Disclosure of

Information, filed August 11, 2017 (Doc. 112), is denied.[17]

---

[16]It is unclear what Laneham means by "minority."  New Mexico is a majority-minority state -- only about forty percent of New Mexicans are non-Hispanic whites.  <u>See</u> Census Quickfacts: New Mexico, https://www.census.gov/quickfacts/fact/table/NM/PST045216 (viewed on October 20, 2017).  Hispanics make up about forty-eight percent of the state's population, <u>see</u> Census Quickfacts: New Mexico, and about fifty percent of Bernalillo County's population, <u>see</u> US Census QuickFacts: Bernalillo County, https://www.census.gov/quickfacts/fact/table/ bernalillocountynewmexico/PST045216.   It is unclear whether Laneham is asserting that Hispanics or African-Americans, or both alone or together, are the minority.   Laneham's references to minorities in southeast Albuquerque, Bernalillo County, and the State of New Mexico, without more definition, precision, and context, are not enlightening.

[17]The Court denies the motion without prejudice to allow Laneham another opportunity if he gets more information.  Given that the United States intends to give Laneham the information

_____
UNITED STATES DISTRICT JUDGE

_Counsel:_

James D. Tierney
   Acting United States Attorney
Norman Cairns
David M. Walsh
   Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

     _Attorneys for the Plaintiff United States_

Todd Bruce Hotchkiss
Todd B. Hotchkiss, Attorney at Law, LLC
Albuquerque, New Mexico

     _Attorney for the Defendant_

---

that it is providing in United States v. Casanova, Laneham may be able to make a better showing
down the road.  At this point, however, he has not met the required standards under Armstrong.